| | |
|---|---|
| DISTRICT COURT, CITY & COUNTY OF DENVER<br>STATE OF COLORADO<br>1437 Bannock Street<br>Denver, Colorado 80202 | FILED Document<br>CO Denver County District Court 2nd JD<br>Filing Date: Sep 08 2012 04:33PM MDT<br>Filing ID: 46336346<br>Review Clerk: Paula Lentini |
| **JAMAL HUNTER,**<br><br>Plaintiff,<br><br>v.<br><br>The **CITY AND COUNTY OF DENVER**, a municipality; Sergeant **KAROLINA SICH**, in her individual and official capacities; Sergeant **MAZONI**, in his individual and official capacities; Deputy **RUMER**, in his/her individual and official capacities; Deputy **KELLER**, in his individual and official capacities; **JOHN DOE ONE**, Denver Sheriff's Department Employee; in his/her individual and official capacities; **JOHN DOE TWO**, Denver Sheriff's Department Employee; in his/her individual and official capacities; **JOHN DOE THREE**, Denver Sheriff's Department Employee, in his/her individual and official capacities; and **JOHN DOE FOUR**, Denver Sheriff's Department Employee, in his/her individual and official capacities;<br><br>Defendants. | ▲ COURT USE ONLY ▲ |
| Attorneys for Plaintiff<br>Siddhartha H. Rathod, # 38883<br>Qusair Mohamedbhai, # 35390<br>RATHOD \| MOHAMEDBHAI LLC<br>1518 Blake Street<br>Denver, Colorado 80202<br>(303) 578-4400 (p)<br>(303) 578-4401 (f)<br>qm@rmlawyers.com<br>sr@rmlawyers.com | Case No:<br><br>Division: |
| **COMPLAINT AND JURY DEMAND** | |

Jamal Hunter ("Plaintiff" or "Mr. Hunter"), by and through his attorneys, Siddhartha H. Rathod and Qusair Mohamedbhai of RATHOD \| MOHAMEDBHAI LLC, respectfully alleges the following Complaint and Jury Demand against the City and County of Denver ("Defendant

Denver"), Sergeant Karolina Sich ("Defendant Sich"), Deputy Mazoni ("Defendant Mazoni"), Deputy Rumer ("Defendant Rumer"), Deputy Keller ("Defendant Keller") and John Doe Denver Sheriff's Department Employees One through Four ("John Doe Defendants") and in support states as follows:

## I.   INTRODUCTION

1.    Mr. Hunter suffered serious injuries while detained at the Van Cise-Simonet Detention Center ("Detention Center"), due to the Denver Sheriff's Department's deliberate indifference to Mr. Hunter's well established constitutional rights.  Mr. Hunter received second and third degree burns to most of his genitalia and a broken nose.

 

*Pictures taken in early 2012, in excess of 6 months after Mr. Hunter's brutal burning.*

 

*Photographs taken of Mr. Hunter's injuries at University Medical Hospital.*

2.    Subsequently, Mr. Hunter was attacked by two Denver Sheriff's Deputy, causing him additional injuries.

3.    This incident is one among many resulting from Denver law enforcements' custom, policy, and practice of engaging in excessive force and failing to monitor, safeguard and protect the health and safety of detainees at the Detention Center.

2

## II.  JURISDICTION AND VENUE

4.  This action arises under the Constitution and laws of the United States and is brought pursuant to Title 42 U.S.C. § 1983. Jurisdiction is conferred on this Court pursuant to Title 28 U.S.C. § 1331. Jurisdiction supporting Plaintiff's claim for attorney fees and costs is conferred by 42 U.S.C. § 1988.

5.  Venue is proper in this Court pursuant to COLO. R. CIV. P. 98(c), in that all of the events alleged herein occurred within the City and County of Denver.

6.  The Court has jurisdiction over the claims asserted herein pursuant to C.R.S. § 13-1-124, Title 42 U.S.C. Sections 1983 and other applicable law.

## III.  PARTIES

7.  At all pertinent times mentioned herein, Mr. Hunter was a citizen of the United States of America and a resident of the State of Colorado.

8.  Defendant Denver is a Colorado municipal corporation. Defendant Denver's Department of Safety is responsible for the oversight, supervision, and training of the Denver Police Department ("DPD") and Denver Sheriff's Department ("DSD"). Defendant Denver was at all relevant times the employer of Defendant Sich, Defendant Mazoni, Defendant Rumer, Defendant Keller, and John Doe Defendants and is a proper entity to be sued under 42 U.S.C. § 1983.

9.  At all times relevant to the subject matter of this litigation, Defendant Sergeant Karolina Sich was a citizen of the United States and a resident of Colorado and was acting under color of state law in her capacity as a law enforcement officer employed as a Sergeant at the Detention Center.

10.  At all times relevant to the subject matter of this litigation, Defendant Sergeant Mazoni (first name unknown) was a citizen of the United States and a resident of Colorado and was acting under color of state law in his/her capacity as a law enforcement officer employed as a Sergeant at the Detention Center.

11.  At all times relevant to the subject matter of this litigation, Defendant Deputy Rumer (first name unknown) was a citizen of the United States and a resident of Colorado and was acting under color of state law in his/her capacity as a law enforcement officer employed as a Deputy at the Detention Center.

12.  At all times relevant to the subject matter of this litigation, Defendant Deputy Keller (first name unknown) was a citizen of the United States and a resident of Colorado and was acting under color of state law in his/her capacity as a law enforcement officer employed as a Deputy at the Detention Center.

13.     At all times relevant to the subject matter of this litigation, John Doe Defendants were citizens of the United States and residents of Colorado and were acting under color of state law in their capacities as a law enforcement officer employed at the Detention Center.

## IV.     FACTUAL BACKGROUND

14.     Mr. Hunter was arrested for a misdemeanor domestic charge and placed in the Detention Center on April 29, 2011. At all times relevant to this Complaint, Mr. Hunter was incarcerated at the Detention Center.

15.     Mr. Hunter was housed in "pod" 5D on the building's fifth floor. The pod is composed of 24 units each occupied by four prisoners. A single Sheriff's Deputy is responsible for supervising all 96 residents in the fifth floor pod.

16.     While in pod 5D, Mr. Hunter shared his cell with another inmate named Chris, who snored loudly and frequently defecated on himself during his sleep.

17.     Due to the unacceptable housing conditions, Mr. Hunter requested that he be transferred to another unit within the same pod. A Sheriff's Deputy advised him that this would be impossible and that he would have to be transferred to another pod altogether. Eventually, Mr. Hunter was moved to pod 5C.

18.     On June 3, 2011, Mr. Hunter was in the shower when another inmate who suffers from Tourette's syndrome experienced a profane outburst. Hearing profanity and believing that a fight was about to ensue, Deputy Rose Nakano responded to the scene. Deputy Nakano requested back up from Deputies William Organ and Daniel Lusk. Deputies Lusk and Organ escorted Mr. Hunter and the other inmate out of the pod. Both inmates were taken to be screened by a nurse and were placed in separate units. Mr. Hunter was taken to pod 4B and the other inmate was taken to pod 3B. The deputies reported that both inmates were cooperative and that no fight had actually occurred. Nonetheless, Mr. Hunter remained in pod 4B which housed residents facing more significant criminal charges than his own.

19.     Within pod 4B several prisoners were abusing drugs. Mr. Hunter complained. Mr. Hunter also requested that Detention Center staff reclassify him and move him back to a more appropriate housing assignment with less dangerous inmates.

20.     Mr. Hunter was transferred to another pod. He was moved to pod 3F and placed in a cell that accommodated a total of eight inmates. In cells that house eight prisoners, residents are locked down for a total of nineteen hours each day in extremely close quarters.

21.     The inmates in pod 3F had even more severe charges pending against them than those in 4B and several were current gang members.

22.     While housed in pod 3F, Mr. Hunter was routinely confronted by other inmates and began to fear for his safety. Mr. Hunter related this information to a Sheriff's Deputy and

requested to be moved to a different cell with less dangerous inmates. The Sheriff's Deputy declined to move Mr. Hunter.

23.     Out of fear for his safety, Mr. Hunter refused to return to his cell and was eventually escorted to a cell in pod 4F. Mr. Hunter repeatedly made it known to Detention Center staff that he simply desired to be housed with inmates who were less dangerous. However, Detention Center staff refused to move him to a less dangerous pod.

24.     While housed in pod 4F, Mr. Hunter issued several written requests for reclassification so he could resume living with less dangerous residents.

25.     On June 10, 2011, Mr. Hunter wrote an inmate grievance stating, "I would like for you to check my level 3 status and consider moving me back to a level 4 status. The inmates that are level 3 have done more harsh crimes then I have."

26.     On June 16, 2011, Mr. Hunter wrote another grievance stating, "I would like to be moved back to and open pod on the 5th floor '5C,' I am being punished for no reason. Please help me by responding to my request and moving back to a open pod on the 5th floor..."

27.     On June 16, 2011, Mr. Hunter wrote to staff objecting to being locked down 19 hours per day with dangerous criminals. He stated, "This is not right seeing that I was not in any confrontation with any one...I am being housed with inmate with more serious charges then I have. I would like to be reclassified...I am not trying to make trouble, I'm just requesting to speak with someone who can help me."

28.     On June 20, 2011 Mr. Hunter filed a grievance stating, "I have wrote 3 different inmate kites concerning my housing classification, I have been misclassified and housed with inmates that have much more serious charges than I have... I was moved to 4B where inmates were sniffing pills, and I complained and I was moved to a 19 hour lock down for no write up, and for nothing at all! This is not right. I should not be locked down for 19 hours per day. Please reclassify me, thank you very much."

29.     Mr. Hunter was subsequently moved by Deputy Anthony Madrid to a cell in pod 3A. In pod 3A, the residents were frequently gambling, organizing wrestling matches and fighting. The Sheriff's Deputies assigned to this pod were complacent and never attempted to address the behavior.

30.     Mr. Hunter was fearful for his safety throughout the entirety of his residency in pod 3A and made this known to Detention Center staff both verbally and in writing on multiple occasions.

31.     On July 18, 2011, Mr. Hunter appeared in court for a scheduled pretrial matter. He was returned to the Detention Center at approximately 1:00 p.m. When Mr. Hunter entered his cell he was confronted by a group of his cellmates. They accused Mr. Hunter of snitching and insulting them behind their backs. One of his cellmates put Mr. Hunter in a chokehold. Another prisoner punched Mr. Hunter in the face and grabbed Mr. Hunter's legs and tied them

together with string.  They picked Mr. Hunter up and moved him to a bed.  The man who had tied Mr. Hunter's legs together punched him in the face a second time, breaking his nose.  Mr. Hunter began bleeding profusely from his nose.  The assailants then untied Mr. Hunter's legs and told him to strip down and get into the cell's shower.  With no other options, Mr. Hunter stripped down to his underwear and entered the shower, afraid he was about to be raped.

32.     At no point during the initial assault did any Detention Center staff intervene to protect Mr. Hunter.

33.     Mr. Hunter washed the blood from his face and exited the shower.  One of Mr. Hunter's cellmates stated he believed Mr. Hunter planned to "snitch" again.  Mr. Hunter denied this and begged his assailants to let him go.  Mr. Hunter cried out but no Detention Center Sheriff's Deputies responded.

34.     One of Mr. Hunter's cellmates told Mr. Hunter words to the effect of, "We're about to have a party."  That man kicked Mr. Hunter in the chest and punched him in the face.

35.     The assailant then left the cell, while Mr. Hunter was guarded by the other men, and quickly returned with a container of scalding water.  Mr. Hunter later identified this man in a photo lineup as Lucio Loboi.  **Mr. Hunter's assailants poured scalding water on his waist, thighs, and genitals.**

36.     Mr. Hunter awoke in a state of immense pain.  Prison staff was finally alerted to the situation by Mr. Hunter's screams.  Defendant Rumer eventually discovered Mr. Hunter.

37.     All Detention Center employees assigned to monitor and supervise inmates, including Defendant Rumer, were deliberately indifferent to Mr. Hunter's safety, by failing to protect him from other inmates and by failing to respond to the assault and burning in a timely manner.

38.     Mr. Hunter was taken to University Medical Hospital.  There, doctors determined that he had sustained second and third degree burns to his inner thighs, genitals, and waist.  He also had a laceration on his eye as a result of blows to his face as well as a broken nose.

39.     Detention Center staff was aware, prior to Mr. Hunter's assault and burning, that a faucet near Mr. Hunter's pod produced water at temperatures close to boiling.

40.     Detective James Medina, who was assigned to investigate Mr. Hunter's brutal assault and burning, contacted Defendant Sich, the on duty supervisor at the time Mr. Hunter was assaulted and burned, almost immediately after Mr. Hunter's assault and burning.  Detective Medina wrote in his report, **"I asked Sgt Sich if the shower water could get hot enough to burn someone, and was told no, but there was a hot water tap located in the immediate vicinity of Dorm 103.  Sgt Sich stated this water does indeed get hot enough to burn skin."**

6

41.     Despite knowing that inmates had access to scalding water, prior to Mr. Hunter's assault and burning, the Detention Center took no corrective or preventative measures and ignored Mr. Hunter's well founded complaints that he was in danger.

42.     Detention Center staff and Detective Medina elected to again ignore Mr. Hunter's concerns for safety, electing not to prosecute and properly investigate Mr. Hunter's assailants.

43.     Detective Medina wrote in his report, "The victim stated if he went through with filing charges he would be killed. The victim stated he should not have been housed with these parties due to level of time these parties are facing... He stated if he filed charges he would be more seriously hurt and just wants the classification of prisoners reviewed and changed."

44.     In an audio recorded interview by Detective Medina of Mr. Hunter, the following was stated:

> **Medina:** Can you tell me what happened to you on the 18[th] when you were . . .
> **Hunter:** You know, you know to be quite honest with you, I don't want to be involved in it because it could get me hurt.
> **Medina:** Uh huh.
> **Hunter:** And, you know, it it's not to any avail to me, you u guys aren't uh – I don't see you guys doing any type of protective work for me and I could get myself killed, uh . . .
> **Medina:** It's up to you.  You want to sign this refusal?  I'll, we'll be done.
>
> . . . .
>
> **Medina:** Granted, It's not a very good position.  Your position is not very good.
> **Hunter:** No it's not a very good position.  My position is a position that - I could be killed.
> **Medina:** Yes sir.
>
> . . . .
>
> **Medina:** What happened to you is a crime, do you want to pursue it?
> **Hunter:** Fuck yeah, I want to pursue it as a crime! But at the same time I'm not trying press charges on anybody, because the reality of it is-
> **Medina:** You could get serious- more hurt, is what I hear you saying.  Sign right there.
> **Hunter:** So what is this?
> **Medina:** This just says you don't want to proceed against these guys.  That's all it's saying.

45.     Detective Medina later wrote, "I talked with Captain Romero and gave him a copy of the victim's refusal form.  I told the captain about my discussion with the victim and told him it sounded as if the victim was planning to sue the DSD.  I then told the captain about the officer safety issue about the prisoners having access to steaming hot water.  I stated this would

probably happen to another prisoner and might happen to a deputy if this issue was not corrected."

46.    Mr. Hunter was only allowed a two-day stay in the hospital before he was returned to the Detention Center.

47.    While at the Detention Center, Mr. Hunter was not receiving adequate medical treatment. He was in constant pain and was very concerned that without better treatment he was going to suffer permanent injuries. Mr. Hunter requested to return to the hospital several times as he was in severe pain and was not receiving adequate treatment.

48.    On July 31, 2011, while Mr. Hunter was resting, Defendant Keller and another Deputy Sheriff awoke Mr. Hunter, escorted him out of his cell and "tore" it apart. The search turned up nothing.

49.    On July 31, 2011, Mr. Hunter filed a grievance elaborating on the incident. He wrote, "I have been made an official enemy of the Denver Sheriff Department...I was housed in a 8 man cell with dangerous felonious men... Only because we are both African American I assume. These same men attacked me, beat me, and scalded me with scalding hot water over my waist, testicles, and penis... The Sheriff's Department has allowed this. Instead of shaking down 3A cell 103 were the incident took place, Deputy Keller... is shaking me down. By not responding to this properly the Sheriff's Department had put my family, my house, and my loved one at risk."

50.    On August 1, 2012, Mr. Hunter was returning from making a phone call when he encountered Defendant Keller. Mr. Hunter told Defendant Keller that he was unhappy about the way he was being treated. Defendant Keller replied, "What do you want me to do? Kiss your ass?" Mr. Hunter explained that he was injured and would merely like to be afforded a basic level of respect. He also mentioned that he was unhappy that the Deputy Sheriffs had turned over his cell in the manner they had.

51.    Defendant Keller lost his temper, grabbed Mr. Hunter by the back of his neck, twisted his arm behind his back and forced him into his cell. Mr. Hunter complained that Defendant Keller was hurting him. Defendant Keller picked Mr. Hunter up by his neck, slammed him down onto the cell's bunk and strangled him. Deputy Ford unsuccessfully tried to stop Defendant Keller's assault of Mr. Hunter. Defendant Keller again slammed Mr. Hunter to the ground. At this point, Defendant Mazoni entered the cell and deployed his Taser on Mr. Hunter. Mr. Hunter again protested and reiterated that he was injured. Deputy Ford instructed Defendant Mazoni not to tase Mr. Hunter again. Defendant Mazoni replied, "If he moves again, I'll tase him again." Deputy Ford then picked Mr. Hunter up and escorted him out of the cell.

52.    On August 10, 2011, Mr. Hunter filed a grievance describing the attack by Defendant Keller and Defendant Mazoni. He wrote, "Mr. Keller an Officer for the Denver Sheriff's Department lost control of himself... choking, punching and body slamming me without cause. As a result I was tasered twice by Sergeant Mazoni. The video tape evidence

will show that I was not resisting or refusing any order; it will show that Officer Keller simply lost control of himself."

53.    On August 25, 2011, after being released from the Detention Center, Mr. Hunter went to the Denver Police Department Headquarters and asked if he could reopen his case. Detective Medina wrote, "Jamal Hunter came into DPD HQ and asked if he could reopen his case about getting burned. I had him write me a statement stating why he would like to reopen the case. The victim stated he was afraid for his safety while he was in jail if he pursued the criminal case."

54.    On September 14, 2011, Mr. Hunter was shown a photo lineup and identified the inmates who assaulted him.

55.    On November 9, 2011, Detective Medina informed Mr. Hunter that he would no longer be working on his case. Detective Medina wrote, "I told [Mr. Hunter] with the DA refusing the case I would not be able to keep working on the case. Mr. Hunter stated he has a lawyer. I told Mr. Hunter I am through with this case. The conversation was ended."

## V.    STATEMENT OF CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
### 42 U.S.C. § 1983
### Eighth and Fourteenth Amendments – Cruel and Unusual Punishment
### (Against All Defendants)

56.    Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

57.    Defendants were acting under color of state law in their actions and inactions at all times relevant to this action.

58.    Providing inmates incarcerated in the Detention Center unsupervised, unmonitored and unrestricted access to unlimited scalding water is a custom, policy or practice of Defendant Denver and a driving force behind Mr. Hunter's constitutional violations as described herein.

59.    Failure to adequately monitor, safeguard and respond to inmates who are suffering physical abuse and potentially life threatening injuries is a custom, policy or practice of Defendant Denver and a driving force behind Mr. Hunter's constitutional violations as described herein.

60.    Failure to discipline employees who previously failed to monitor and ensure inmate health and safety is a custom, policy or practice of Defendant Denver and a driving force behind Mr. Hunter's constitutional violations as described herein.

61.     Defendant Denver's custom, policy and practices of defending the conduct, failing to discipline, timely discipline, consistently and publically exonerating and maintaining the employment of employees that engage in unconstitutional behavior, including but not limited to those Denver Sheriff's Deputies involved in the Emily Rice and Marvin Booker incidents was a driving force behind Mr. Hunter's constitutional violations as described herein.

62.     The acts and omissions of Defendants were engaged in pursuant to the custom, policy, and practice of Defendant Denver, which encourages, condones, tolerates, and ratifies the constitutional violations described herein.

63.     Defendants were deliberately indifferent to an obvious risk of serious harm by placing Mr. Hunter into a situation which was virtually certain to, and did, result in assaults and burning. This was without necessity, right, legal justification or excuse and with such conscious or callous indifference to the rights of the Plaintiff as to rise to a level repugnant to the conscience of a reasonable person.

64.     Defendants knowingly inflicted unnecessary and wanton pain upon Plaintiff by housing him with dangerous inmates without monitoring and supervision. Defendants knew that these dangerous inmates had access to an unlimited supply of scalding water.

65.     Defendants exhibited deliberate indifference to the substantial risk of harm inflicted upon Mr. Hunter by failing to ensure that he was not placed in a high security cell with dangerous inmates who had access to unlimited scalding water.

66.     Defendants knew of the substantial risk of serious harm to Mr. Hunter posed by dangerous inmates with access to scalding water. Such deliberate indifference to the safety and protection of inmates resulted in Mr. Hunter's assault, burning and permanent injuries.

67.     Defendants failed to provide humane conditions of confinement for Mr. Hunter by failing to implement practices, policies and procedures that protect inmates, including inmates such as Mr. Hunter, from the substantial risk of serious harm posed by dangerous inmates with unfettered access to unlimited scalding water.

68.     Defendants, by and through their official duties, failed to and continue to fail to properly train, supervise, monitor and/or discipline their employees regarding proper housing procedures and the protection of inmates from assaults and burning from known dangerous conditions, resulting in inhumane conditions of confinement and a deliberate indifference to the substantial risk of serious harm to Mr. Hunter and other similarly situated inmates.

69.     The inadequate training, supervision, monitoring and/or discipline results from a conscious or deliberate choice to follow a course of action from among various alternatives available to Defendants.

70.     In light of the duties and responsibilities of the Denver Sheriff's Department who exercise control over individuals incarcerated within the Detention Center, the need for scrutiny in specialized training, supervision, monitoring and/or discipline regarding the safety and

housing of inmates is so obvious, and the inadequacy of appropriate training, supervision, monitoring and/or discipline is so likely to result in the violation of constitutional rights, such as those described herein, that the Defendants are liable for their failure to appropriately train, supervise, monitor and/or discipline Defendant Denver's personnel. Such failure to properly train and supervise their employees was and continues to be the moving force and proximate cause of the violation of Mr. Hunter's constitutional rights and the rights of other inmates.

71.     The acts or omissions of each Defendant were the legal and proximate cause of Mr. Hunter's damages in that he suffered assaults and burning while in Defendants' custody.

72.     As a direct and proximate cause and consequence of the unconstitutional policies, procedures, customs, and/or practices described above, Mr. Hunter suffered assaults and burning.

73.     Defendants' malicious conduct in violating Mr. Hunter's rights was wanton and willful and was so intolerable to society's standards of fundamental fairness that it violated Mr. Hunter's Eighth and Fourteenth Amendment right to be free from cruel and unusual punishment.

### SECOND CLAIM FOR RELIEF
### 42 U.S.C. § 1983
### Eighth and Fourteenth Amendments – Danger Creation
### (Against Defendants Denver, Sich, Rumer and John Doe Defendants)

74.     Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

75.     Defendants were acting under color of state law in their actions and inactions at all times relevant to this action.

76.     Providing inmates incarcerated in the Detention Center unsupervised, unmonitored and unrestricted access to unlimited scalding water is a custom, policy or practice of Defendant Denver and a driving force behind Mr. Hunter's constitutional violations as described herein.

77.     Failure to discipline employees who previously failed to monitor and ensure inmate health and safety is a custom, policy or practice of Defendant Denver and a driving force behind Mr. Hunter's constitutional violations as described herein.

78.     Failure to adequately monitor, safeguard and respond to inmates who are suffering physical abuse and potentially life threatening injuries is a custom, policy or practice of Defendant Denver and a driving force behind Mr. Hunter's constitutional violations as described herein.

79.     Defendant Denver's custom, policy and practices of defending the conduct, failing to discipline, timely discipline, consistently and publically exonerating and maintaining the employment of employees that engage in unconstitutional behavior, including but not limited

11

to those Denver Sheriff's Deputies involved in the Emily Rice and Marvin Booker incidents was a driving force behind Mr. Hunter's constitutional violations as described herein.

80.     The acts and omissions of Defendants were pursuant to the custom, policy, and practice of Defendant Denver, which encourages, condones, tolerates, and ratifies the constitutional violations described herein.

81.     Defendants created the danger that led to Mr. Hunter's injuries by knowingly housing him with dangerous inmates who had unsupervised, unmonitored and unrestricted access to unlimited scalding water.

82.     The scalding water was knowingly provided to dangerous inmates with unsupervised, unmonitored and unrestricted access.

83.     Defendants were aware that inmates had access to scalding water prior to Mr. Hunter's tragic assault and burning.

84.     Defendants acted with a conscious disregard to the known and serious risk of danger to Mr. Hunter when he was housed with dangerous inmates who had unsupervised, unmonitored and unrestricted access to unlimited scalding water.

85.     Defendants failed to abate a known dangerous condition that existed in the Detention Facility.

86.     Defendants defectively designed and built its Detention Facility that permitted inmates unsupervised, unmonitored and unrestricted access to unlimited scalding water.

87.     Defendants failed to monitor Mr. Hunter's housing area and had insufficient surveillance technology including cameras to monitor the inmates that were housed with Mr. Hunter.

88.     Defendants failed to make adequate physical rounds of Mr. Hunter's housing area.

89.     In the weeks prior to his assaults and burning, Mr. Hunter put Defendants on detailed and specific notice through numerous Kites and verbal communications that he was fearful for his safety because he was housed with gang members and other dangerous inmates with greater security classification levels.

90.     Defendants ignored Mr. Hunter's communications and continued to house Mr. Hunter with known dangerous gang members and inmates who had unsupervised, unmonitored and unrestricted access to unlimited scalding water, placing him at a substantial risk of immediate harm.

91.     These failures in facility design, monitoring, training and supervision is so grossly reckless and was conducted with such a conscious disregard for the rights of inmates that future misconduct was, and is, virtually inevitable.

92.     As an inmate, Mr. Hunter was a member of a limited and specifically definable group.

93.     When viewed in total, this conduct is so outrageous that it shocks the conscience.

94.     The acts or omissions of each Defendant were the legal and proximate cause of Mr. Hunter's injuries and damages in that he suffered extreme physical injury and emotional injury as a result of his multiple assaults and genital burning.

## THIRD CLAIM FOR RELIEF
### 42 U.S.C. § 1983
### Eighth and Fourteenth Amendments – Failure to Protect
### (Against Defendants Denver, Sich, Rumer and John Doe Defendants)

95.     Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

96.     Defendants were acting under color of state law in their actions and inactions which occurred at all times relevant to this action.

97.     Providing inmates incarcerated in the Detention Center unsupervised, unmonitored and unrestricted access to unlimited scalding water is a custom, policy or practice of Defendant Denver and a driving force behind Mr. Hunter's constitutional violations as described herein.

98.     Failure to discipline employees who previously failed to monitor and ensure inmate health and safety is a custom, policy or practice of Defendant Denver and a driving force behind Mr. Hunter's constitutional violations as described herein.

99.     Failure to adequately monitor, safeguard and respond to inmates who are suffering physical abuse and potentially life threatening injuries is a custom, policy or practice of Defendant Denver and a driving force behind Mr. Hunter's constitutional violations as described herein.

100.    Defendant Denver's custom, policy and practices of defending the conduct, failing to discipline, timely discipline, consistently and publically exonerating and maintaining the employment of employees that engage in unconstitutional behavior, including but not limited to those Denver Sheriff's Deputies involved in the Emily Rice and Marvin Booker incidents was a driving force behind Mr. Hunter's constitutional violations as described herein.

101.    By incarcerating Mr. Hunter and thereby assuming control over him and depriving him of his liberty to care for himself, Defendants created a special relationship with Mr. Hunter that required Defendants to assume an affirmative duty of care and protection of him.

102.    Defendants have an affirmative duty of care and protection of Mr. Hunter because he was in custody and held against his will.

103.    Defendants were in positions of authority at the Detention Center and had actual knowledge of dangerous inmates having unsupervised, unmonitored and unrestricted access to unlimited scalding water prior to Mr. Hunter's injury.

104.    As an incarcerated inmate held by Defendants, Mr. Hunter's freedom to act on his own behalf is limited.

105.    Defendants recklessly and with conscious disregard to the serious and obvious risk to inmate safety, failed to protect Mr. Hunter by knowingly housing him with dangerous inmates who had unsupervised, unmonitored and unrestricted access to unlimited scalding water.

106.    Defendants recklessly and with conscious disregard to the serious and obvious risk to inmate safety, failed to protect Mr. Hunter from the known risks of harm inherent with dangerous inmates who had unsupervised, unmonitored and unrestricted access to unlimited scalding water.

107.    Defendants' conduct amounts to deliberate indifference to the rights of inmates, including Mr. Hunter, with whom detention officials inevitably come into contact, and over whom detention officials exercise control.

108.    When viewed in total, Defendants' conduct shocks the conscience.

109.    Defendants failed to and continue to fail to properly hire, train, supervise, monitor and/or discipline their employees regarding the protection of inmates, including Mr. Hunter, from other inmates with access to dangerous weapons such as scalding water with no penological purpose, resulting in a constitutional failure to protect Mr. Hunter.

110.    The inadequate training, monitoring and/or supervision provided by Defendants results from a conscious or deliberate choice to follow a course of action from among various alternatives available to Defendants.

111.    Such policies, as well as Defendants' actions and inactions, violated Mr. Hunter's substantive due process right under the Fourteenth Amendments to the United States Constitution.

112.    The acts or omissions of each Defendant were the legal and proximate cause of Mr. Hunter's injuries and damages in that he suffered extreme physical injury and emotional injury as a result of his multiple assaults and genital burning.

14

## FOURTH CLAIM FOR RELIEF
## 42 U.S.C. § 1983
### Fourth and Eighth Amendments – Excessive Force
### (Against Defendants Denver, Keller and Mazoni)

113.    Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

114.    Plaintiff had a constitutionally protected and clearly established right to be secure in his person against unreasonable seizures of the person.

115.    Defendants unlawfully seized Plaintiff by means of excessive physical force and thereby unreasonably restrained his freedom.

116.    Defendants' actions, as described above, were objectively unreasonable in light of the facts and circumstances confronting them.

117.    Defendants' actions, as described above, were motivated by intent to harm Plaintiff.

118.    Defendants' actions, as described herein, were undertaken intentionally, maliciously, willfully, wantonly and/or in reckless disregard of Plaintiff's federally protected rights.

119.    Defendants' conduct violated clearly established rights belonging to Plaintiff of which reasonable law enforcement knew or should have known.

120.    Plaintiff has been and continues to be damaged by Defendants' use of excessive force against him.

121.    The acts or omissions of each Defendant, including the unconstitutional policy, procedure, custom and/or practice described herein, were the legal and proximate cause of Plaintiff's damages.

122.    As a direct result of Defendants' unlawful action as described above, Plaintiff suffered actual physical, emotional, and economic injuries in an amount to be proven at trial.

123.    Defendant Denver's failure to train, discipline and/or supervise on matters of excessive force and use of force generally, as described herein, was a legal and proximate cause of Plaintiff's injuries.

124.    All individual Defendants to this claim, at all relevant times hereto, were acting under the color of state law in their capacities as Denver Sheriff's Department Deputies.

15

125.    The acts and omissions of Defendants were engaged in pursuant to the custom, policy, and practice of Defendant Denver, which encourages, condones, tolerates, and ratifies the use of excessive force by law enforcement officers in the City.

## FIFTH CLAIM FOR RELIEF
### (42 U.S.C. § 1983 – Failure to Train or Supervise)
### (Against Defendant Denver, Sich, Mazoni and John Doe Defendants)

126.    Plaintiffs hereby incorporate all other paragraphs of this Complaint as if fully set forth herein.

127.    Defendants failed to properly train and supervise its or her employees to monitor and protect inmates and avoid the use of excessive force.

128.    Defendants knew, or should have known, that its or her employees would fail to monitoring, protect and use reasonable force, violating inmates' constitutional rights.

129.    Defendants failed to adequately in their supervisory duties to monitor, safeguard and respond to inmates who are suffering physical abuse and potentially life threatening injuries is a custom, policy or practice of Defendant Denver and a driving force behind Mr. Hunter's constitutional violations as described herein.

130.    Defendants were deliberately indifferent to the constitutional rights of Detention Center inmate, knowing that dangerous and potentially fatal dangerous conditions existed in the Detention Center and consequences could be suffered by such individuals, including Mr. Hunter, by failing to properly monitor, train, supervise, discipline, and timely discipline their employees. Defendants could have and should have pursued reasonable methods for abatement of known dangerous conditions, monitoring, training and supervising of such employees, but failed to do so.

131.    Defendant Denver's policies, customs, or practices in failing to properly monitor, train, supervise and discipline its employees were the moving force and proximate cause of the violation to Mr. Hunter's constitutional rights.

132.    The custom, policy, and practice of Defendant Denver of encouraging, condoning, tolerating, and ratifying of the failure to monitor and protect inmate, failure to abate a known dangerous condition, failures to monitor, train, supervise, discipline and timely discipline employees and the use of excessive force by law enforcement officers in Denver, as described herein, were the moving force behind and proximate cause of the violation to Mr. Hunter's constitutional rights.

133.    The acts or omissions of Defendants caused Mr. Hunter damages in that he suffered extreme physical and mental pain during the assault and burning that resulted in permanent injury.

16

134.   The actions of Defendants as described herein deprived Mr. Hunter of the rights, privileges, liberties, and immunities secured by the Constitution of the United States of America, and caused him other damages.

WHEREFORE, Plaintiff respectfully request that this Court enter judgment in his favor and against each of the Defendants, and award him all relief allowed by law, including but not limited to the following:

(a) All appropriate relief at law and equity;

(b) Declaratory relief and other appropriate equitable relief;

(c) Economic losses on all claims as allowed by law;

(d) Compensatory and consequential damages, including damages for emotional distress, humiliation, loss of enjoyment of life, and other pain and suffering on all claims allowed by law in an amount to be determined at trial;

(e) Punitive damages on all claims allowed by law and in an amount to be determined at trial;

(f) Attorneys fees and the costs associated with this action, including expert witness fees, on all claims allowed by law;

(g) Pre- and post-judgment interest at the appropriate lawful rate; and

(h) Any further relief that this court deems just and proper, and any other relief as allowed by law.

## PLAINTIFF HEREBY DEMANDS A JURY TRIAL ON ALL ISSUES SO TRIABLE.

Respectfully submitted this 8th day of September 2012.

> RATHOD | MOHAMEDBHAI LLC
> s/ Qusair Mohamedbhai
> Qusair Mohamedbhai
> Siddhartha H. Rathod
> RATHOD | MOHAMEDBHAI LLC
> 1518 Blake Street
> Denver, Colorado 80202
> (303) 578-4400 (p)
> (303) 578-4401 (f)
> qm@rmlawyers.com
> sr@rmlawyers.com
> www.rmlawyers.com
> ATTORNEYS FOR PLAINTIFF

17