**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action Number: 12-cv-02682-JLK

JAMAL HUNTER,

      Plaintiff,

v.

CITY AND COUNTY OF DENVER, a municipality,
Sergeant ANTHONY MAZZEI in his individual and official capacity,
Deputy GAYNEL RUMER, in his individual and official capacity,
Deputy EDWARD KELLER, in his individual and official capacity,

      Defendants.

_____

**PLAINTIFF'S RESPONSE TO DEFENDANT RUMER'S
MOTION FOR SUMMARY JUDGMENT**
_____

Plaintiff Jamal Hunter ("Mr. Hunter"), by and through counsel Arash Jahanian,

Qusair Mohamedbhai, Matthew Cron, and Siddhartha Rathod of RATHOD |

MOHAMEDBHAI LLC, pursuant to Fed. R. Civ. P. 56, D.C.Colo.LCivR 56.1, and this

Court's Pretrial and Trial Procedures, hereby responds to Defendant Deputy Gaynel

Rumer's ("Defendant Rumer") Motion for Summary Judgment [ECF No. 39] as follows:

**I. <u>INTRODUCTION</u>**

During the afternoon of July 18, 2011, Plaintiff Jamal Hunter was brutally

assaulted while under the protection of the Denver Sheriff's Department and Defendant

Deputy Gaynel Rumer at the Denver Van Cise-Simonet Detention Center. Mr. Hunter's

attackers beat him and knocked him unconscious several times before scalding his genitals and thighs with hot water, which was available to all inmates without restriction. Mr. Hunter suffered multiple fractures and second-degree burns, and he has permanent scarring and numbness. One of the inmates in Mr. Hunter's pod described the attack as a "mauling and torture." Defendant Rumer's supervisor, who had been with the Denver Sheriff's Department for 22 years, testified that it was the worst inmate-on-inmate attack she has ever seen.

Defendant Rumer was complicit in the attack and indeed facilitated the attack. Contrary to the assertions made by Defendant Rumer, Mr. Hunter does not rely on speculative conspiracy theories. Rather, his evidence consists of sworn statements of the inmates who were involved in and witnessed the attack. Defendant Rumer told Mr. Hunter's attackers, who ran the pod and dealt in contraband with Defendant Rumer's assistance, that Mr. Hunter was snitching on them. Defendant Rumer offered to turn off the lights to the cell so that the assailants could address the situation without being caught on camera. Defendant Rumer knew that Mr. Hunter would be violently assaulted because of Defendant Rumer's relationship with the attackers and because he had previously allowed rampant fighting to occur so that inmates could address their conflicts.

Defendant Rumer's actions during the attack, which were captured on camera, further support the conclusion that he was indispensable to the success and ultimate

outcome of the attack. After turning out the lights to Mr. Hunter's cell, Defendant Rumer unlocked the cell door so that Mr. Hunter's assailants could come and go as needed. As such they were able to further conspire with Defendant Rumer and other inmates and ultimately obtain the hot water used to cause permanent damage to Mr. Hunter's genitalia. This water, which was available to inmates without restriction from a spigot in the common area of their pod, was so hot that inmates complained that it melted plastic containers. Throughout the attack, Defendant Rumer willfully ignored Mr. Hunter's screaming that other inmates throughout the pod still vividly recall, and in the end he delayed in going to Mr. Hunter's aid. Defendant Rumer's explanations for his actions during the attack have been inconsistent and contradicted by other evidence and common logic.

Defendant Rumer's conduct violates Mr. Hunter's clearly established rights to be free from cruel and unusual punishment under the Eighth Amendment to the U.S. Constitution, and to receive protection of those holding him in custody under the Fourteenth Amendment. By facilitating the vicious attack on Mr. Hunter, Defendant Rumer was deliberately indifferent to Mr. Hunter's safety in a situation that clearly posed a risk of serious harm. Defendant Rumer's Motion misses the point, both factually and legally. His attempt to analyze each of his willful violations of Mr. Hunter's federally protected rights in isolation distorts the analysis and reality. Each of Defendant Rumer's actions over the course of the attack does alone constitute deliberate indifference in

violation of Mr. Hunter's clearly established constitutional rights. But taking these actions in the context of the collusion with Mr. Hunter's attackers truly brings the egregiousness of Defendant Rumer's conduct to light.

<u>Conferral Regarding Use of Confidential Exhibits</u>

Undersigned counsel conferred with defense counsel Stuart Shapiro, Esq. concerning the use of exhibits in this Response that have been designated as "confidential," invoking coverage of this Court's Stipulation and Protective Order [ECF No. 18]. All confidentially designated documents will be concurrently filed as Restricted Access Level 1. Thereafter, pursuant to D.C.COLO.LCivR 7.2, the parties will confer regarding whether a motion to restrict access is appropriate for some or all of the documents filed as restricted. Because this brief quotes the confidentially designated documents, it is filed in two formats: redacted and public [ECF No. 52], and unredacted and restricted [ECF No. 53].

## II. <u>RESPONSE TO STATEMENT OF UNDISPUTED MATERIAL FACTS</u> ("RSUMF")

1. **Admit.**

2. **Deny.** Defendant Rumer offered to turn off the lights in cell 103 so that the attack on Mr. Hunter could be carried out, and Mr. Hunter's assailants accepted his offer. <u>Ex. 1</u>, Page Aff. ¶ 12. Inmates asked guards to turn out lights so they could get away with prohibited activities including fighting. <u>Ex. 1</u>, Page Aff. ¶ 4; <u>Ex. 2</u> Rhee Aff. ¶¶ 6, 16. The lights being off inside cell 103 prevented the cameras from capturing what was

occurring inside the cell.  <u>Ex. 1</u>, Page Aff. ¶ 12; <u>Ex. 3</u>, Than 30(b)(6) Dep. 105:20-24; <u>Ex. 4</u>, 2011.07.22 Than Email ████████████████████████████████████ ████████████████████████████  The lights, which are fluorescent, did not make the cell hot.  <u>Ex. 5</u>, Mayo Aff. ¶ 14; <u>Ex. 6</u>, Hunter Dep. 145:14-16; *see also* <u>Ex. 7</u>, Sich Dep. 54:7-55:3, 56:9-17; <u>Ex. 3</u>, Than 30(b)(6) Dep. 79:23-80:3, 80:17-81:1. Deputies who feel the temperature is too hot in a housing unit are to ask maintenance to adjust the temperature, which Defendant Rumer did not do on July 18, 2011.  <u>Ex. 3</u>, Than (30)(b)(6) Dep. 81:14-82:6; <u>Ex. 7</u>, Sich Dep. 55:17-56:3; *see also* <u>Ex. 29</u>, Rumer Dep. 47:4-11, 17-20.

3.      **Deny.**  On previous occasions Defendant Rumer had turned off the lights to cells so that inmates could fight.  <u>Ex. 1</u>, Page Aff. ¶ 4.

4.      **Admit in part.**  Admit that Defendant Rumer was aware of inmate access to hot water and that he claims he was not aware of the exact temperature of the water and the damage it would cause prior to the assault on Mr. Hunter, but see RSUMF ¶ 5, Statement of Additional Disputed Facts ("SADF") ¶¶ 92-94, *infra* with respect to inmate complaints, Defendant Rumer's characterization of the temperature of water, and his awareness of and concerns regarding the damaging effects of the water after the attack.

5.      **Deny.**  Defendant Rumer testified that on or about July 2011 he overheard inmates say that the water was hot.  <u>Ex. 29</u>, Rumer Dep. 82:22-83:1.  Inmates complained to

guards and each other about how hot the water was.  Ex. 2, Rhee Aff. ¶ 18; Ex. 8, Jackson Aff. ¶ 20; Ex. 9, Anderson Aff. ¶ 25; Ex. 10, Neal Aff. ¶ 14.

6.     **Admit**, but Mr. Hunter's deposition cannot be cited for this proposition.

7.     **Deny.**  Prior to the installation of the hot water spigots, there had been several hot water attacks at the Denver Van Cise-Simonet Detention Center ("Denver Detention Center").  On September 24, 2010, inmate T.B., while in G dorm, poured hot water from a hot pot onto inmate C.W.  Ex. 11, Hot Water Incidents at Denver10175.  On July 10, 2011, inmate W.N. was sprayed in the face with hot water while in the kitchen by inmate M.B.  *Id.* at Denver10176.

8.     **Admit in part.**  Admit that Defendant Rumer claims he asked the tier porters to secure the door, but deny that he checked the door.  ███████████████████████

█████████████████████████████████████████████████████████

██████████████████████████  Ex. 12, 2011.10.24 Rumer IAB Interview Report at Denver273; *see also id.* at Denver272████████████████████████████

████████████████████████████.  In his predisciplinary meeting, Defendant Rumer testified: ████████████████████████████████████████████

████████████████████████████████████  Ex. 13, 2011.06.21 Rumer Predisciplinary Meeting Audio 4:53-5:18.

9.     **Admit.**  *See also* SADF ¶ 89 *infra.*

10. **Deny.** It does not appear that Defendant Rumer looked inside the cells when he was performing a round during the attack on Mr. Hunter. Ex. 7, Sich Dep. 71:19-72:2; Ex. 14, 2011.07.18 Pod 3A Round Video of Defendant Rumer; Ex. 15, 2011.07.18 Pod 3A SW Camera 15:09:33-15:10:28; Ex. 16, 2011.07.18 Pod 3A NW Camera 15:10:28-15:11:36.[1]

11. **Deny.** Sergeant Karolina Sich, Defendant Rumer's supervisor in July 2011, testified that tier porters and their cells were subject to the same lockdown procedures as

---

[1] In the Northwest camera angle, "Cell 103 appears to be kind of centered in the middle of the screen, kind of upper middle." Wilson 116:1-6.



other inmates and cells.  Ex. 7, Sich Dep. 40:15-41:4; *see also* Ex. 17, 2011.09.09 Sich

IAB Interview Report at Denver253.

12.    **Deny.**  Sergeant Sich testified that hot water should not be passed around and

"should only be utilized for the groups that are out."  Ex. 7, Sich Dep. 132:9-14.

13.    **Admit.**

14.    **Admit.**

15.    **Admit.**

16.    **Admit.**

17.    **Admit.**

18.    **Admit.**

19.    **Deny.**  On July 18, 2011, the day of the assault, an inmate who had gone to court

at the same time as Mr. Hunter told other inmates including Amos Page, a/k/a "OC," that

Mr. Hunter had been "talking shit" about Page and his crew.  Ex. 1, Page Aff. ¶ 12; *see*

*also* Ex. 9, Anderson Aff. ¶ 3; Ex. 10, Neal Aff. ¶ 15; Ex. 18, Sudberry Aff. ¶ 20; Ex. 19,

Shepard Aff. ¶ 3; Ex. 20, 2011.09.14 Gutierrez IAB Interview Report at Denver257.

Defendant Rumer confirmed this information for Page and went out of his way to

describe Mr. Hunter as a "snitch."  Ex. 1, Page Aff. ¶ 12.  Prior to the attack, Page told

Defendant Rumer that he was going to "take care of" the situation.  *Id.*  Defendant Rumer

offered to turn off the lights and told Page to make sure the assault occurred before his

shift was over.  *Id.*  Defendant Rumer "knew the consequences on Hunter were going to

be severe," based on previous experiences with Page and his crew. *Id.* Other inmates saw Page and Defendant Rumer speaking before the incident. Ex. 8, Jackson Aff. ¶ 17; Ex. 9, Anderson Aff. ¶ 9. Video of Pod 3A shows Defendant Rumer speaking with Page and inmate Michael Nicolato prior to the attack, and again later during the attack. Ex. 15, 2011.07.18 Pod 3A SW Camera 14:32:09-31; Ex. 16, 2011.07.18 Pod 3A NW Camera 15:03:19-52; Ex. 21, IAB Incident Video Report at Denver276.

20.  **Admit.**

### III. STATEMENT OF ADDITIONAL DISPUTED FACTS

**A.  Defendant Rumer's Supervision of Pod 3A**

1.  Inmates in Pod 3A of the Denver Van Cise-Simonet Detention Center ("Denver Detention Center"), where Mr. Hunter was assaulted on July 18, 2011, described Defendant Rumer as a lazy guard who did not care about what inmates were doing and frequently turned a blind eye to things that he should have addressed as part of his job. *See* Ex. 8, Jackson Aff. ¶¶ 12, 18, 28; Ex. 18, Sudberry Aff. ¶¶ 9-10; Ex. 10, Neal ¶ 3; Ex. 22, Gonzales Aff. ¶ 6; Ex. 19, Shepard Aff. ¶ 8.

2.  Inmates who wanted to get away with things that they should not have been doing waited for Defendant Rumer to come on his shift. Ex.1, Page Aff. ¶ 4; Ex. 8, Jackson Aff. ¶ 12; Ex. 5, Mayo ¶ 11; Ex. 18, Sudberry ¶¶ 11, 15; Ex. 19, Shepard Aff. ¶ 5; Ex. 23, Thomson Aff. ¶¶ 6, 8.

3.      Inmates perceived Defendant Rumer to be drunk during work and smelled alcohol on his breath.  <u>Ex. 6</u>, Hunter Dep. 54:16-17, 57:5-19; <u>Ex. 1</u>, Page Aff. ¶ 2; <u>Ex. 5</u>, Mayo Aff. ¶ 3; <u>Ex. 8</u>, Jackson Aff. ¶ 6; <u>Ex. 19</u>, Shepard Aff. ¶ 4; <u>Ex. 20</u>, Neal Aff. ¶ 7; <u>Ex. 22</u>, Gonzales Aff. ¶ 7; <u>Ex. 23</u>, Thomson Aff. ¶ 4; <u>Ex. 24</u>, Sanford Aff. ¶ 7; <u>Ex. 25</u>, Lang Aff. ¶ 5.

4.      One day, inmate Amos Page, a/k/a "OC," caught Defendant Rumer with a thermos full of vodka and extorted him for cigarettes and a lighter.  <u>Ex. 1</u>, Page Aff. ¶ 2.

5.      After that, Defendant Rumer and Page "went into business together," with Defendant Rumer bringing in pornographic magazines and marijuana for Page to sell to other inmates.  <u>Ex. 1</u>, Page Aff. ¶¶ 3, 10.

6.      Pod 3A was controlled by inmate Page and his crew of inmates, with the help of Defendant Rumer and the other guards.  <u>Ex. 1</u>, Page Aff. ¶ 4; <u>Ex. 8</u>, Jackson Aff. ¶ 21; <u>Ex. 9</u>, Anderson Aff. ¶ 13; <u>Ex. 19</u>, Shepard Aff. ¶ 3.

7.      Marijuana, pornography, and other forms of contraband including crack and cigarettes were prevalent in Pod 3A.  *See* <u>Ex. 1</u>, Page Aff. ¶¶ 3, 10; <u>Ex. 2</u>, Rhee ¶¶ Aff. 6, 8, 12; <u>Ex. 5</u>, Mayo Aff. ¶ 5; <u>Ex. 8</u>, Jackson Aff. ¶ 26; <u>Ex. 18</u>, Sudberry Aff. ¶ 11; <u>Ex. 22</u>, Gonzales Aff. ¶ 3; <u>Ex. 24</u>, Sanford Aff. ¶ 3; <u>Ex. 26</u>, Loboi Aff. ¶ 9.

8.      Inmates made and drank "hooch" (moonshine) with virtual impunity in Defendant Rumer's presence.  <u>Ex. 1</u>, Page Aff. ¶ 11; <u>Ex. 8</u>, Jackson Aff. ¶¶ 7; <u>Ex. 18</u>, Sudberry Aff. ¶ 11; <u>Ex. 25</u>, Lang Aff. ¶ 8; *see also* <u>Ex. 2</u>, Rhee Aff. ¶¶ 10, 11, 14; <u>Ex. 5</u>, Mayo Aff. ¶¶

5, 16; <u>Ex. 18</u>, Sudberry Aff. ¶ 7; <u>Ex. 19</u>, Shepard Aff. ¶¶ 3, 6; <u>Ex. 22</u>, Gonzales Aff. ¶ 3;

<u>Ex. 24</u>, Sanford Aff. ¶ 3; <u>Ex. 26</u>, Loboi Aff. ¶ 8; <u>Ex. 27</u>, Tinsley Aff. ¶ 6.

9.      Defendant Rumer allowed and even encouraged rampant fighting to occur in Pod

3A, as a means for inmates to address problems with other inmates.  *See* <u>Ex. 1</u>, Page Aff.

¶ 4; <u>Ex. 9</u>, Anderson Aff. ¶¶ 19-21; <u>Ex. 25</u>, Lang Aff. ¶ 4; <u>Ex. 10</u>, Neal Aff. ¶ 5; <u>Ex. 8</u>,

Jackson Aff. ¶¶ 8-12; <u>Ex. 18</u>, Sudberry Aff. ¶¶ 4, 12; <u>Ex. 23</u>, Thomson Aff. ¶ 6; <u>Ex. 2</u>,

Rhee Aff. ¶¶ 2, 6; <u>Ex. 27</u>, Tinsley Aff. ¶ 5; <u>Ex. 6</u>, Hunter Dep. 72:4-24, 74:5-8, 16-22;

<u>Ex. 28</u>, Hunter IAB Interview at Denver249.

10.     If Defendant Rumer did not like an inmate, he would approach Page and tell him

to "take care of it," which meant to inflict violence on the inmate.  <u>Ex. 1</u>, Page Aff. ¶ 5;

*see also* <u>Ex. 6</u>, Hunter Dep. 68:21-69:3, 69:24-70:2, 70:6-8, 70:23-71:4, 71:16-19.

11.     Page "had total control" over Defendant Rumer.  <u>Ex. 1</u>, Page Aff. ¶ 8; *see also* <u>Ex.</u>

<u>8</u>, Jackson Aff. ¶ 9; <u>Ex. 19</u>, Shepard Aff. ¶ 8.

12.     Defendant Rumer shared information about inmates such as grievances they had

submitted and their underlying crimes with other inmates, which compromised inmate

safety.  <u>Ex. 1</u>, Page Aff. ¶ 6; <u>Ex. 18</u>, Sudberry Aff. ¶ 16; <u>Ex. 10</u>, Neal Aff. ¶ 4; <u>Ex. 23</u>,

Thomson Aff. ¶¶ 5,7; <u>Ex. 9</u>, Anderson Aff. ¶¶ 3, 17, 22.

13.     Mr. Hunter and Defendant Rumer did not care for each other.  <u>Ex. 1</u>, Page Aff. ¶¶

7, 13; <u>Ex. 9</u>, Anderson Aff. ¶ 22; <u>Ex. 6</u>, Hunter Dep. 53:19-54:2, 55:5-9, 55:21-24, 56:17-

20.  Mr. Hunter openly mocked Defendant Rumer for being drunk.  <u>Ex. 1</u>, Page ¶ 7.

14.     Inmates considered Pod 3A to be dangerous and out of control, with many saying that it was more dangerous than being housed in prison.  <u>Ex. 8</u>, Jackson Aff. ¶ 27; <u>Ex. 27</u>, Tinsley Aff. ¶ 3; <u>Ex. 26</u>, Loboi Aff. ¶ 3; <u>Ex. 2</u>, Rhee Aff. ¶ 3; <u>Ex. 23</u>, Thomson Aff. ¶ 11; <u>Ex. 19</u>, Shepard Aff. ¶ 3; <u>Ex. 28</u>, 2011.08.03 Hunter IAB Interview Report at Denver249-50.

15.     Page and the inmates who ran Pod 3A were tier porters, so they had enhanced access to Defendant Rumer and the other guards, and had special privileges like food and clothes.  <u>Ex. 1</u>, Page Aff. ¶ 5; <u>Ex. 19</u>, Shepard Aff. ¶¶ 6, 8; <u>Ex. 5</u>, Mayo Aff. ¶¶ 6-7; <u>Ex. 25</u>, Lang Aff. ¶ 4; <u>Ex. 2</u>, Rhee Aff. ¶¶ 8-10; <u>Ex. 26</u>, Loboi Aff. ¶¶ 6-7; <u>Ex. 27</u>, Tinsley Aff. ¶ 8.

16.     Defendant Rumer found tier porters Page, Michael Nicolato, and Fermin Velasquez to be truthful and honest in their dealings with him.  <u>Ex. 29</u>, Rumer Dep. 158:6-17.

17.     Tier porters were unrestricted in their ability to enter and leave their cells.  <u>Ex. 29</u>, Rumer Dep. 253:5-10; <u>Ex. 1</u>, Page Aff. ¶ 1; <u>Ex. 2</u>, Rhee Aff. ¶ 9; <u>Ex. 26</u>, Loboi Aff. ¶ 6; <u>Ex. 5</u>, Mayo Aff. ¶ 9; <u>Ex. 19</u>, Shepard Aff. ¶ 8; <u>Ex. 28</u>, 2011.08.03 Hunter IAB Interview Report at Denver249; <u>Ex. 12</u>, 2011.10.24 Rumer IAB Interview Report at Denver 266.

18.     In July 2011, Defendant Rumer left the door to cell 103 unlocked because there were three tier porters housed there.  <u>Ex. 29</u>, Rumer Dep.157:7-19; <u>Ex. 12</u>, 2011.10.24 Rumer IAB Interview Report at Denver273; <u>Ex. 30</u>, 2011.07.18 OIC Staff Report at

Denver369 (███████████████████████████████████████████████████

████████████████████████████████████████████████████████); <u>Ex. 1</u>,

Page ¶ 5.

## B. The Assault on Mr. Hunter

| Timeline of Events on July 18, 2011 | |
| --- | --- |
| (not on video) | Mr. Hunter was confronted, punched, tied up, and knocked unconscious. SADF ¶¶ 19-20. |
| 2:37 p.m. | Defendant Rumer entered cell 103 as part of his roll call and overlooked the attack. SADF ¶ 21. |
| 2:40 p.m. | Defendant Rumer turned off the lights to cell 103.  SADF ¶ 22. |
| (not on video) | Mr. Hunter was physically assaulted, bled so much he had to clean himself off in the shower, and was again knocked unconscious.  SADF ¶¶ 23-26. |
| 3:03 p.m. | Defendant Rumer unlocked the cell to 103 so that the assailants could exit.  SADF ¶ 27. |
| 3:09 p.m. | Defendant Rumer began his "round" as the assailants went to the yard. SADF ¶ 35. |
| 3:11 p.m. | Defendant Rumer finished his "round," and the assailants returned to cell 103.  SADF ¶¶ 36-40. |
| 3:13 p.m. | Defendant Rumer gave inmate Page a trash bag, which the attackers intend to use to smother Mr. Hunter to death.  SADF ¶¶ 41, 43. |
| 3:14 p.m. | Page retrieved the hot water used to burn Mr. Hunter.  SADF ¶ 44. |
| 3:20 p.m. | Defendant Rumer first heard Mr. Hunter screaming (according to his testimony, though the inmates had heard it for some time).  SADF ¶¶ 48, 63-64. |
| 3:21 p.m. | Defendant Rumer discovered Mr. Hunter outside cell 103.  SADF ¶ 54. |

### i. The Inmates Began Assaulting Mr. Hunter, and Defendant Rumer Did a Roll Call and Turned Out the Lights

19.     During the afternoon of July 18, 2011, Mr. Hunter was confronted by Page and other inmates including Dwight Robinson in Pod 3A, cell 103 about having "talked shit" about them. Ex. 6, Hunter Dep. 76:20-77:5; Ex. 28, 2011.08.03 Hunter IAB Interview Report at Denver246; Ex. 26, Loboi Aff. ¶ 13.

20.     Mr. Hunter was "choked out," punched, and tied up by his legs before he lost consciousness. Ex. 28, 2011.08.03 Hunter IAB Interview Report at Denver246; Ex. 6, Hunter Dep. 77:6-13, 79:25-80:7, 90:13-20; 92:7-10, 93:16-19, 95:14-96:4; Ex. 31, 2011.07.23 Gutierrez Email; Ex. 18, Sudberry Aff. ¶ 21; Ex. 24, Sanford Aff. ¶ 8.

21.     At approximately 2:37 p.m., Defendant Rumer entered cell 103 as part of his roll call and overlooked the attack on Mr. Hunter. Ex. 16, 2011.07.18 Pod 3A NW Camera 14:37:10-14:38:47; *see also* Ex. 29, Rumer Dep. 175:18-176:4; Ex. 9, Anderson Aff. ¶ 6; Ex. 18, Sudberry ¶ 22; Ex. 1, Page ¶ 13.

22.     Defendant Rumer turned off the lights for the entire lower tier of Pod 3A, and then turned on the lights in cell 102 while the rest of the tier including cell 103 remained off. Ex. 16, 2011.07.18 Pod 3A NW Camera 14:40:15-14:40:48; Ex. 29, Rumer Dep. 141:4-142:4; Ex. 33, 2012.09.14 Rumer Discipline Letter at Denver495.

### ii. With the Lights Off, the Assault on Mr. Hunter Intensified, and Defendant Rumer Unlocked Cell 103

23.    When Mr. Hunter regained consciousness, he was on his bed with his hands and legs tied together, and the lights were off.  Ex. 28, 2011.08.03 Hunter IAB Interview Report at Denver 246; Ex. 6, Hunter Dep. 92:9-11, 101:3-5, 108:8-11.

24.    Mr. Hunter's assailants "rained down on" him with a "hail of punches."  Ex. 6, Hunter Dep. 102:13-16, 104:12-106:23; Ex. 31, 2011.07.23 Gutierrez Email.

25.    Because Mr. Hunter was bleeding profusely, Page untied him and told him to go clean himself in the shower, and Mr. Hunter complied.  Ex. 28, 2011.08.03 Hunter IAB Interview Report at Denver246; Ex. 6, Hunter Dep. 109:11-14, 110:7-21, 111:25-112:7, 114:10-20.

26.    When Mr. Hunter returned to his bunk, his assailants said, "We're going to have a little fun with you," and again rained down on Mr. Hunter with punches, causing Mr. Hunter to lose consciousness again.  Ex. 6, Hunter Dep. 121:6-122:8, 123:8-12; *see also* Ex. 28, 2011.08.03 Hunter IAB Interview Report at Denver246.

### iii. Defendant Rumer Let Mr. Hunter's Assailants Out of Cell 103

27.    At 3:03 p.m., Defendant Rumer unlocked the door to cell 103, and inmates Page, Nicolato, and Velasquez approached him and had a conversation.  Ex. 16, 2011.07.18 Pod 3A NW Camera 15:03:19-52; Ex. 21, IAB Incident Video Report at Denver276; Ex. 33, 2012.09.14 Rumer Discipline Letter at Denver495.

28.     Defendant Rumer wrote in his report of the assault that the ████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████     Ex. 30, 2011.07.18 OIC Staff Report at Denver368; *see also* Ex.

29, Rumer Dep. 150:11-151:4, 153:16-19; Ex. 17, 2011.09.09 Sich IAB Interview Report

at Denver253; Ex. 12, 2011.10.24 Rumer IAB Interview Report at Denver270.

29.     Inmates should not be permitted to clean their cells in the dark because they

cannot see what they are doing.  Ex. 7, Sich Dep. 104:9-16.

30.     When asked if inmates can clean cells in the dark, Defendant Rumer responded:

"I can't answer that."  Ex. 29, Rumer Dep. 153:23-154:1.

31.     ████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████     Ex. 33, 2012.09.14 Rumer

Discipline Letter at Denver495.

32.     At 3:09 p.m., inmates Page, Nicolato, Corey Shepard left cell 103 with inmate

Billy Jackson and walked to the basketball court (also known as "the yard") to have a

conversation.  Ex. 34, 2011.07.18 Pod 3A Sallyport Camera 15:09:20-42; Ex. 21, IAB

Incident Video Report Denver 278; Ex. 29, Rumer Dep. 215:24-216:9.

33.     After the attack, Sergeant Sich phoned Defendant Rumer ███████████

████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████ Ex. 30, 2011.07.18 OIC Staff Report at Denver369.

34.     That night, Sergeant Sich sent an email to Division Chief Michael Than in which

she stated: ████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████ Ex. 36, 2011.07.18 Sich-Than Email.

### iv.     Defendant Rumer Conducted a "Round" of Pod 3A

35.     As the inmates were walking to the basketball court, Defendant Rumer began his

round at approximately 3:09:33 p.m.  Ex. 34, 2011.07.18 Pod 3A Sallyport Camera

15:09:30-42.

36.     Defendant Rumer was back at his desk approximately two minutes later, after

walking by cells 101, 102, 201, 202, 203, 204, 103, and 104 and scanning his Personal

Digital Assistant ("PDA") by those cells to record his round.  Ex. 14, 2011.07.18 Pod 3A

Round Video of Defendant Rumer; Ex. 15, 2011.07.18 Pod 3A SW Camera 15:09:33-

15:10:28; Ex. 16, 2011.07.18 Pod 3A NW Camera 15:10:28-15:11:36; *see also* Ex. 29,

Rumer Dep. 93:14-18.

37.    It did not appear that Defendant Rumer broke stride while he was performing this round.  Ex. 7, Sich Dep. 71:7-9; *see also* Ex. 29, Rumer Dep. 113:7-10 ("I observed that I continued my walk.").

38.    Defendant Rumer estimates he spent two to three seconds in front of cell 103, and did not pass all the windows of the cell.  Ex. 29, Rumer Dep. 114:18-23; *see also* Ex. 7, Sich Dep.76:22-77:2.

39.    One inmate saw Defendant Rumer do a quick round without checking into his cell, and walk right by cell 103 and do nothing while Mr. Hunter was getting beat.  Ex. 19, Shepard Aff. ¶¶ 9, 13.

**v.    After the "Round," Defendant Rumer Continued to Assist Mr. Hunter's Assailants**

40.    At 3:11 p.m., in a matter of seconds after Defendant Rumer completed his round, the assailants returned from the basketball court to cell 103.  Ex. 16, 2011.07.18 Pod 3A NW Camera 15:11:20-59.

41.    At 3:13 p.m., Page then retrieved a garbage bag from Defendant Rumer, even though he did not present a used bag to Defendant Rumer, and returned to cell 103 with it. Ex. 16, 2011.07.18 Pod 3A NW Camera 15:13:10-40; Ex. 21, IAB Incident Video Report at Denver279.

42.    Defendant Rumer testified that his practice is always that when an inmate asks for a new trash bag, he will not get one unless he presents a bag full of trash.  Ex. 29, Rumer Dep. 135:14-23; Ex. 32, 2011.10.24 Rumer IAB Audio 2:04:21-55.

43.     The assailants had discussed smothering Mr. Hunter with a trashbag to kill him, but they ultimately decided against it.  Ex. 9, Anderson Aff. ¶ 5; Ex. 24, Sanford Aff. ¶ 8.

44.     At 3:14 p.m., Page exited the cell, got hot water from the spigot, and returned to burn Mr. Hunter with the hot water.  Ex.52, 2011.07.18 Video of Amos Page; Ex. 34, 2011.07.18 Pod 3A Sallyport Camera 15:14:00-15:14:45; Ex. 18, Sudberry Aff. ¶ 21; Ex. 24, Sanford Aff. ¶ 8; Ex. 26, Loboi Aff. ¶ 13; Ex. 8, Jackson Aff. ¶¶ 18-19; Ex. 21, IAB Incident Video Report at Denver279; Ex. 20, 2011.09.14 Gutierrez IAB Interview Report at Denver257 (Inmate Gardner informed Captain Silver Gutierrez that Robinson held down Mr. Hunter while Page poured the hot water on Mr. Hunter's genitals.).

45.     ████████████████████████████████████████████

█████████████████████████████████████ Ex. 33, 2012.09.14 Rumer Discipline Letter at Denver495; *see also* Ex. 16, 2011.07.18 Pod 3A NW Camera 15:07:30-15:09-45; Ex. 8, Jackson Aff. ¶ 18; Ex. 25, Lang Aff. ¶ 9; Ex. 19, Shepard Aff. ¶ 7; Ex. 13, 2011.06.21 Rumer Prediscipinary Meeting Audio 1:45-55, 28:16-32.

### vi.     Defendant Rumer Finally Acknowledged Mr. Hunter's Screams but Delayed in Locating Mr. Hunter

46.     At 3:20 p.m., Defendant Rumer walked by cell 103 and remained in the area for some time before running up to the door to cell 103, touching it, running upstairs, and walking all around the second floor.  Ex. 16, 2011.07.18 Pod 3A NW Camera 15:19:51-15:22:00.

47.    Defendant Rumer testified that does not know why he touched the door to cell 103, other than guessing that he wanted to make sure it was shut.  <u>Ex. 29</u>, Rumer Dep. 261:1-18, 264:6-14.

48.    Defendant Rumer testified in his deposition that he first heard Mr. Hunter scream right after he touched the door to cell 103 and was still near cell 103.  *See* <u>Ex. 29</u>, Rumer Dep. 185:13-15, 215:10-13, 263:20-264:2, 264:6-11; <u>Ex. 16</u>, 2011.07.18 Pod 3A NW Camera 15:20:51:



49.     Defendant Rumer had initially stated that he was on the upper tier when he heard

Mr. Hunter's screams.  Ex. 30, 2011.07.18 OIC Staff Report at Denver 368, Denver369;

Ex. 17, 2011.09.09 Sich IAB Interview Report at Denver252; Ex. 7, Sich Dep. 97:14-

98:3.

50.     Defendant Rumer said that he ran upstairs because had trouble hearing where the

scream was coming from.  Ex. 29, Rumer Dep. 183:9-15; Ex. 12, 2011.10.24 Rumer IAB

Interview Report at Denver 266; Ex. 7, Sich Dep. 94:14-15, 21-24.

51.     No other deputies had told Sergeant Sich that it is hard to pinpoint the location of

sounds or that they had trouble hearing where shouts were coming from within a cell.

Ex. 7, Sich Dep. 94:25-95:3, 96:1-4; 97:8-11; *see also* Ex. 9, Anderson Aff. ¶ 8.

52.     Defendant Rumer had testified to the IAB that ███████████████████████

████████ ████████████████████████████████████████████████████

█████████████████████████  Ex. 12, 2011.10.24 Rumer IAB Interview Report at

Denver272.

53.     One inmate said he was "[n]ot sure why it took Rumer so long to figure out where

the burning was happening.  It didn't seem like it was bothering Rumer too much and he

was sure taking his time to get in there like he was trying to delay."  Ex. 8, Jackson Aff. ¶

22; *see also* Ex. 19, Shepard Aff. ¶ 14 ("I have no clue as to why it took so long to get to

Hunter after the scream."); Ex. 9, Anderson Aff. ¶ 8.

54.     At approximately 3:21 p.m., first encountered Mr. Hunter was outside cell 103,

approximately one-and-a-half minutes after he claims to have heard Mr. Hunter scream.

Ex. 16, 2011.07.18 Pod 3A NW Camera 15:21:58.

55.     Upon being instructed that Sergeant Sich "was done with 103," Defendant Rumer

had the tier porters clean the cell.  Ex. 29, Rumer Dep. 185:16-187:9; Ex. 12, 2011.10.24

Rumer IAB Interview Report at Denver275; *see also* Ex. 27, Tinsley Aff. ¶ 21 ("It was

mindblowing and surreal to me that the guy involved was cleaning up the blood.").

### vii.     Mr. Hunter Suffered Serious, Permanent Injuries as a Result of the Attack

56.     Mr. Hunter was treated in the University of Colorado Burn Unit and then Denver

Health until July 22, 2011 for fractures surrounding his left eye, a nasal fracture, and

██████████████████████████████████████████

██████████████████████████████████████ Ex. 36, University of

Colorado Hospital Records; Ex. 37, Denver Health Records at Denver39, Denver 44; Ex.

38, Pieracci Dep. 16:10-19:7, 28:16-29:23.



*Photos of Mr. Hunter's Face and Thigh by Sergeant Sich Following Attack*

57.     Mr. Hunter's treating physician at Denver Health said that his injuries "in the acute setting, and even the weeks to months subsequently, . . . were very painful." Ex. 38, Pieracci Dep. 47:11-13.  Three days after the assault, Mr. Hunter experienced pain measured at eight out of ten, which indicated severe pain.  *Id.* 33:17-34:7; 2011.07.21 Ex. 37, Denver Health Records at Denver106.

58.     At "approximately 21 months post second degree scald burns to the perineal area, anterior things, scrotum, and penis," Mr. Hunter continues to suffer areas of scarring and discoloration on his thighs that "are conspicuous and of a permanent nature." Ex. 39, 2013.04.15 Independent Medical Examination at Denver2978; *see also* Ex. 6, Hunter Dep. 198:21-200:3.

59.     Mr. Hunter also continues to suffer from numbness and itching in the areas that were burned.  Ex. 39, 2013.04.15 Independent Medical Examination Denver2977; Ex. 6, Hunter Dep. 200:5-9, 200:22-201:2, 202:23-203:25, 211:20-212:10.

60.     Mr. Hunter's injuries were the worst injuries Sergeant Sich had seen in an inmate-on-inmate attack in her 22 years with the Denver Sheriff's Department ("DSD"). Ex. 7, Sich Dep. 6:1-3, 121:19-22.

**C.  Defendant Rumer's Involvement and Responsibility in the Attack on Mr. Hunter**

**i.  Inmates' Observations Supported Defendant Rumer's Involvement in the Long, Brutal Attack**

61.    Page said that the attack could not have been pulled off without Defendant Rumer's help.  Ex. 1, Page Aff. ¶ 15.

62.    Some inmates could tell Defendant Rumer was ignoring the attack, which was not entirely surprising given their experiences with Defendant Rumer.  *See* Ex. 25, Lang Aff. ¶ 9 ("Rumer was on duty, and it was the same old thing.  I remember he was trying to look busy while the fight was happening, but he wasn't busy.  He knew that there was a fight in there by the way he was acting, trying to look busy."); Ex. 19, Shepard Aff. ¶ 9 (Rumer "was ignoring the situation like it wasn't even happening.  Even for Rumer, this was cold and calculated."); Ex. 8, Jackson Aff. ¶ 18.

63.    Inmates thought Defendant Rumer must have heard the attack, given Mr. Hunter's screams.  Ex. 8, Jackson Aff. ¶ 18 ("[I]f I could hear the beating, Rumer could have heard it too because I was not that far from him."); Ex. 18, Sudberry Aff. ¶ 22; Ex. 5, Mayo Aff. ¶ 19, Ex. 27, Tinsley Aff. ¶ 17; Ex. 19, Shepard Aff. ¶ 7; Ex. 10, Neal Aff. ¶ 9.

64.    Inmates throughout Pod 3A vividly described Mr. Hunter's loud and lengthy screaming throughout the attack.  Ex. 5, Mayo Aff. ¶ 17 ("Jamal was screaming like nothing I had ever heard before, and he was screaming for a while"); *Id.* ¶ 18 ("like a woman, like his life was on the line"); Ex. 27, Tinsley Aff. ¶ 15 ("bloody murder"); Ex.

18, Sudberry Aff. ¶ 23; Ex. 1, Page Aff. ¶ 15; Ex. 8, Jackson Aff. ¶¶ 18, 22; Ex. 25, Lang Aff. ¶ 9; Ex. 26, Loboi Aff. ¶ 11.  One inmate stated:  "I still remember the scream of Hunter when he was burned.  It was one of the worst sounds I have ever heard."  Ex. 19, Shepard Aff. ¶ 14.  Another inmate stated that he could hear Mr. Hunter screaming from the basketball court. Ex. 9, Anderson Aff. ¶ 7.

65.     During the assault, Mr. Hunter was knocked unconscious several times.  *See* Ex. 1, Page Aff. ¶ 13; Ex. 18, Sudberry Aff. ¶ 21; Ex. 24, Sanford Aff. ¶ 8; Ex. 6, Hunter Dep. 88:7-9, 99:20-100:3, 122:5-8, 123:8-12, 130:3-4.

66.     Mr. Hunter's attackers kicked him repeatedly, including one kick of his head into the ground that led an inmate witness to believe he was dead.  *See* Ex. 9, Anderson Aff. ¶ 6; Ex. 24, Sanford Aff. ¶ 8.

67.     Inmates who were housed next door in cell 102 referred to the attack as "a mauling and torture," Ex. 5, Mayo Aff. ¶¶ 18, 19, and said they "thought [Mr. Hunter] was being beat to death."  Ex. 27, Tinsley Aff. ¶ 18.

**ii.     Defendant Rumer Continued to Protect Page and the Other Assailants During the Internal Affairs Investigation**

68.     Defendant Rumer told the DSD Internal Affairs Bureau ("IAB") that ██████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

Ex. 12, 2011.10.24 Rumer IAB Interview Report at Denver275; *see also* Ex. 24, Sanford Aff. ¶ 10 (Defendant Rumer let Page out of cell 103 so he would not be caught).

69.     He later told the IAB that █████████████████████████████████

████████████████████████████████████████████████████████████████

████ Ex. 13, 2011.06.21 Rumer Predisciplinary Meeting Audio 9:24-10:30.

70.     Defendant Rumer testified to the IAB that inmates Gardner, Robinson, and Loboi

were involved in the assault on Mr. Hunter.  He did not identify Page.  Ex. 12,

2011.10.24 Rumer IAB Interview Report at Denver269.

71.     Mr. Hunter, inmate Gardner, and a confidential inmate identified Page as one of

the assailants.  Ex. 40, Denver Police Department Supplemental Report at Hunter219; Ex.

41, 2011.08.01 Romero-Billings Email; Ex. 31, 2011.07.23 Gutierrez Email at

Denver289; Ex. 20, 2011.09.14 Gutierrez IAB Interview Report at Denver257.

### iii.     Defendant Rumer Violated Post Orders and His Supervisor's Instructions by Turning Off the Lights in Cell 103

72.     The Post Orders governing eight-man housing units at the Denver Detention

Center (such as cell 103) state: ███████████████████████████████████

███████████████████████████████████████████ Ex. 42, Denver Detention

Center 8-Man Housing Unit Post Order at Denver19730; *see also* Ex. 29, Rumer Dep.

57:9-14.

73.     ██████████████████████████████████████████████████████

█████████████████████████████████████ Ex. 43, 2012.06.27 Kilroy-Wilson

Memorandum at Rumer143.

74.     During his October 24, 2011 IAB interview, Defendant Rumer ██████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████ <u>Ex.</u>

<u>12</u>, 2011.10.24 Rumer IAB Interview Report at Denver270.

75.     Then, during his June 21, 2012 predisciplinary meeting, Defendant Rumer stated:

████████████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████████████

<u>Ex. 13</u>, 2011.06.21 Rumer Predisciplinary Meeting Audio 14:17-15:12.

76.     Prior to the assault on Mr. Hunter, Sergeant Sich had reprimanded Defendant

Rumer, both verbally and through making entries in his PEP book, regarding lights in the

pods and allowing inmates to have makeshift curtains.  <u>Ex. 7</u>, Sich Dep. 61:18-62:20; *see*

*also id.* 91:24-92:3, 98:10-12, 99:12-22.

77.     During the course of this case, Defendant Rumer has maintained that he "was

informed by his supervisors that he had discretion in running the pod that included

turning the lights off in the pod when inmates complained about heat during daylight

hours in the summer." <u>Ex. 44</u>, Rumer Discovery Responses at 14-15; *see also* <u>Ex. 29</u>,

Rumer Dep. 66:12-19.

78.     Among other reasons, the reason why lights are to be on during the day in eight-man housing units is to ensure that staff can see inside the cells during rounds.  Ex. 3, Than (30)(b)(6) Dep. 82:18-83:6.

### iv.     Defendant Rumer Violated Post Orders and His Supervisor's Instructions by Letting the Assailants Out of Cell 103

79.     Prior to the assault on Mr. Hunter, Sergeant Sich had reprimanded Defendant Rumer that deputies, and not inmates, should close doors.  Ex. 7, Sich Dep. 98:25-99:3; Ex. 30, 2011.07.18 OIC Staff Report at Denver369; Ex. 17, 2011.09.09 Sich IAB Interview Report at Denver253; Ex. 45, 2011.07.19 Sich-Than Email; *see also* Ex. 46, 2011.10.07 Romero IAB Interview Report at Denver260 (negative entry had been made into Defendant Rumer's file regarding securing of doors).

80.     In late 2010, the Post Orders regarding doors were revised to state: ████████

██████████████████████████████████████████████████████

████████████████████████████████████████████

████████████████  Ex. 42, Denver Detention Center 8-Man Housing Unit Post Order at Denver19727; Ex. 43, Deeds Email.

81.     Preventing the comingling of inmates from the upper and lower tiers is a preventative measure to reduce inmate on inmate violence.  Ex. 7, Sich Dep. 24:6-11.

### v. Defendant Rumer's "Round" Was in Violation of Post Orders and Conducted in Such a Way to Compromise Inmate Safety

82.     Upon observing the round that Defendant Rumer performed on July 18, 2011 during the attack on Mr. Hunter, Sergeant Sich characterized it as "what he considers to be a round." Ex. 7, Sich Dep. 70:10-18.

83.     Defendant Rumer did not perform his round to any of the requirements of the DSD Post Orders or to training expectations, and Sergeant Sich believes that Defendant Rumer should have been reprimanded for the way he performed his round. Ex. 7, Sich Dep. 70:19-22, 73: 21-74:4, 76:10-12, 78:24-79:5. Prior to the assault on Mr. Hunter, there was nothing that prevented Defendant Rumer from performing his rounds appropriately that day. *Id.* 144:8-18.

84.     The lights being off and the rapid speed with which Defendant Rumer was walking would not allow him to see what was going on in cell 103. Ex. 7, Sich Dep. 77:8-15; *see also id.* 70:23-71:6 ("[I]f I was doing a round, even as a supervisor, I couldn't just pass the windows that fast and observe possibly what might be going on in there."); *id.* 72:9-22 (Deputies are not supposed to do rounds with the cell lights off, because it is difficult to see what is going on inside); Ex. 17, 2011.09.09 Sich IAB Interview Report at Denver255 (same); *see also* Ex. 3, Than 30(b)(6) Dep. 105:20-24; Ex. 4, 2011.07.22 Than Email.

85. The central premise of rounds is to check on the wellbeing of inmates and their safety. Ex. 48, Wilson (30)(b)(6) Dep. 89:9-20; Ex. 7, Sich Dep. 68:11-16; Ex. 42, Denver Detention Center 8-Man Housing Unit Post Order Denver19724.

86. Rounds are one of the most effective methods of ensuring inmate safety and security, and help ensure that inmates are not hurting each other. Ex. 7, Sich Dep. 19:5-9, 20:9-12, 30:3-7.

87. During each round, the goals of deputies are to ensure that lights are not covered; windows are not covered; bedding is not arranged so that it impedes the officer's ability to see the inmate when the officers look into the unit; pictures and other items are not fastened to the walls; there are no marks or graffiti on the walls; there is no accumulated paper or debris; vents are not covered; the showers are cleaned and in good working order; the janitor's closet clean and in good working order; the recreation yard is clean and has no safety or security flaws. Ex. 42, Denver Detention Center 8-Man Housing Unit Post Order at Denver19724; Ex. 48, Wilson (30)(b)(6) Dep. 88:19-89:13.

88. Deputies should visually observe the inmates and talk to the inmates during rounds. Ex. 7, Sich Dep. 19:9-11.

89. Deputies are expected to go into every cell during a round, because not everything can always be seen from the window, including the shower and whether an inmate lying down is breathing. Ex. 7, Sich Dep. 64:21-65:4, 65:22-66:10, 67:8-13, 129:6-12; Ex. 29, Rumer Dep. 106:6-11.

90.     In an eight-man housing unit, there is an expectation that a deputy will spend more than three seconds in front of a cell when performing a round.  Ex. 7, Sich Dep.74:17-23.

91.     A deputy performing a round too quickly would miss almost everything, such as an inmate not be breathing and weapons, and "could jeopardize a lot in that unit."  Ex. 7, Sich Dep. 79:11-80:5.

**vi.     Defendant Rumer Was Aware of the Dangerous Nature of the Hot Water**

92.     Inmates described the extreme temperature of the hot water in Pod 3A through observations such as that it melted plastic containers.  *See* Ex. 8, Jackson Aff. ¶ 20; Ex. 5, Mayo Aff. ¶ 13; Ex. 27, Tinsley Aff. ¶ 14; Ex. 26, Loboi Aff. ¶ 16; Ex. 10, Neal Aff. ¶ 14; Ex. 2, Rhee Aff. ¶ 17; Ex. 22, Gonzales Aff. ¶ 11; Ex. 19, Shepard Aff. ¶ 12; Ex. 18, Sudberry Aff. ¶ 25.

93.     During the IAB investigation Defendant Rumer stated:  ████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

Ex. 32, 2011.10.24 Rumer IAB Audio 2:01:08-2:03:00; *see also* Ex. 12, 2011.10.24 Rumer IAB Interview Report at Denver274.

94.     Defendant Rumer acknowledged that 160-degree water can be used as a weapon, and that inmate access to hot water was unrestricted on July 18, 2011. Ex. 29, Rumer Dep. 84:14-21.

**D.      Defendant Rumer's Investigation and Discipline**

95.     After the IAB investigation, Defendant Rumer was suspended for 40 days for his conduct during the July 18, 2011 attack on Mr. Hunter.[2] Ex. 49, 2012.09.18 Romero-Than Memorandum; Ex. 33, 2012.09.14 Rumer Discipline Letter; Ex. 50, Stipulation and Agreement.

96.     Defendant Rumer was suspended for knowingly making a misleading or inaccurate statement, engaging in conduct prejudicial to DSD, and for disobeying department rules including with regard to lights and securing of doors.  *See* Ex. 33, 2012.09.14 Rumer Discipline Letter at Denver493; Ex. 43, 2012.06.27 Kilroy-Wilson Memorandum at Rumer143; Ex. 51, Kilroy Dep. 45:24-46:19; Ex. 29, Rumer Dep. 189:20-190:1.

97.     Defendant Rumer did not agree with any of the discipline that was imposed.  Ex. 29, Rumer Dep. 190:2-15.

98.     Defendant Rumer was presented with the option of agreeing to a 40-day suspension or be terminated, because of the inaccurate statements.  *See* Ex. 29, Rumer

---

[2] Defendant Rumer does not specifically allege his suspension as an undisputed material fact, but he inaccurately states in the introduction of his brief that his suspension was for 20 days.  (Def. Rumer's Mot. Summ. J. at 3.)

Dep. 195:4-11, 197:2-9; <u>Ex. 50</u>, Stipulation and Agreement; <u>Ex. 51</u>, Kilroy Dep. 52:20-23; <u>Ex. 13</u>, 2011.06.21 Rumer Predisciplinary Meeting Audio 24:09-42.

99.    During the June 21, 2012 predisciplinary meeting, Defendant Rumer stated ███

████████████████████████████████████████████████████████

████████████████████████████████████████████

███████    <u>Ex. 13</u>, 2011.06.21 Rumer Predisciplinary Meeting Audio 1:20-34.  He███████

████████████████████████████████████████████████

██████████████    *Id.* 7:45-8:04.

100.    Deputy Manager of Safety Ashley Kilroy found that Defendant Rumer's statement that Sergeant Sich had given him discretion to turn off the lights constituted an inaccurate statement.  <u>Ex. 51</u>, Kilroy Dep. 59:7-20.

101.    Sergeant Sich believed that Defendant Rumer was being dishonest when answering her questions about the assault on Mr. Hunter, specifically with respect to his explanation of whether he or the inmates secured the door cell 103, and with respect to the location of the tier porters during the incident.  <u>Ex. 7</u>, Sich Dep. 105:3-6, 9-19, 106:5-18, 106:25-107:7; <u>Ex. 17</u>, 2011.09.09 Sich IAB Interview Report at Denver253-55.

102.    Sergeant Sich testified that watching how Defendant Rumer had performed the rounds during the assault of Mr. Hunter reinforced her beliefs that he was not entirely forthcoming with her about the incident.  <u>Ex. 7</u>, Sich Dep. 107:24-108:6.

103.   It crossed Sergeant Sich's mind that Defendant Rumer may have been involved in the assault on Mr. Hunter.  <u>Ex. 7</u>, Sich Dep. 108:25-109:8.

## IV. STANDARD OF REVIEW

### A.   <u>Summary Judgment</u>

To obtain summary judgment the movant must show the absence of a genuine issue of material fact through materials in the record.  Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Evidence is viewed in the light most favorable to the nonmovant.  *Simms v. Oklahoma*, 165 F.3d 1321, 1326 (10th Cir. 1999).  "Where different ultimate inferences may be drawn from the evidence presented by the parties, the case is not one for summary judgment."  *Brown v. Parker-Hannifin Corp.,* 746 F.2d 1407, 1411 (10th Cir. 1984).  "The advantages of trial before a live jury with live witnesses, and all the possibilities of considering the human factors, should not be eliminated by substituting trial by affidavit and the sterile bareness of summary judgment. . . . Trial by affidavit is no substitute for trial by jury which so long has been the hallmark of even handed justice."  *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 176 (1970) (Black, J., concurring); *see also Fisher v. Shamburg*, 624 F.2d 156, 162 (10th Cir. 1980); Arthur R. Miller, *The Pretrial Rush to Judgment: Are the "Litigation Explosion," "Liability Crisis," and Efficiency Cliches Eroding Our Day in Court and Jury Trial Commitments?*, 78 N.Y.U.L. Rev. 982, 1134 (2003) ("Taking decisionmaking authority from juries runs counter to basic and long-cherished principles of our system.").

Defendant Rumer has not met his burden, and this case is one where issues of material fact demand denial of summary judgment and trial by jury.

**B.    Qualified Immunity**

Mr. Hunter has overcome Defendant Rumer's claim of qualified immunity by demonstrating violation of his clearly established constitutional rights under the Eighth and Fourteenth Amendments. *See, e.g.*, *Reynolds v. Powell*, 370 F.3d 1028, 1030 (10th Cir. 2004). To demonstrate whether a right was "clearly established," plaintiffs need not establish a "precise factual correlation between the then-existing law and the case at hand . . . ." *Patrick v. Miller*, 953 F.2d 1240, 1249 (10th Cir. 1992) (quotation omitted). The Supreme Court has held that "a general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question, even though the very action in question has not previously been held unlawful." *Hope v. Pelzer*, 536 U.S. 730, 741 (2002) (quotation omitted).

The Tenth Circuit similarly has "never said that there must be a case presenting the exact fact situation at hand in order to give parties notice of what constitutes actionable conduct. Instead, we merely require the parties to make a reasonable application of existing law to their own circumstances." *Johnson v. Martin*, 195 F.3d 1208, 1216 (10th Cir. 1999) (internal quotations and citations omitted). Government "officials committing outrageous, yet *sui generis*, constitutional violations ought not be able to shield their behavior behind qualified immunity simply because another official

has not previously had the audacity to commit a similar transgression." *Fuerschbach v. Southwest Airlines Co.*, 439 F.3d 1197, 1206 n.4 (10th Cir. 2006). The qualified immunity analysis is not merely "a scavenger hunt for prior cases with precisely the same facts." *Pierce v. Gilchrist*, 359 F.3d 1279, 1298 (10th Cir. 2004). Rather, the "more relevant inquiry" is "whether the law put officials on fair notice" that their actions were unconstitutional. *Id.*

## V. ARGUMENT

Defendant Rumer violated Mr. Hunter's clearly established constitutional rights by inciting and facilitating a vicious inmate attack. Defendant Rumer's individual acts of deliberate indifference in turning off the cell lights, unlocking the door, shirking his duties during the performance of rounds, enabling the assailants' access to scalding water, and ignoring the attack before finally responding in a delayed manner, were the vehicles through which he exposed Mr. Hunter to extreme danger. While each of these acts would in itself violate Mr. Hunter's clearly established constitutional rights, isolating them from the context of Defendant Rumer's knowledge and facilitation of the attack is to distort reality. Defendant Rumer went beyond deliberate indifference to Mr. Hunter's wellbeing and safety, as he was an active and willful participant in the brutal attack that leaves Mr. Hunter with permanent scars.

## A. <u>Legal Standard</u>

Defendant Rumer violated of Mr. Hunter's clearly established constitutional rights to be free from cruel and unusual punishment under the Eighth Amendment and his substantive due process rights under the Fourteenth Amendment. "'Prison officials have a duty . . . to protect prisoners from violence at the hands of other prisoners.'" *Benefield v. McDowall*, 241 F.3d 1267, 1270 (10th Cir. 2001) (quoting *Farmer v. Brennan*, 511 U.S. 825, 833 (1994)). "Suffering physical assaults in prison is not 'part of the penalty that criminal offenders pay for their offenses against society.'" *Id.* at 1271 (quoting *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981)). "A prison official's deliberate indifference to a substantial risk of serious harm to an inmate violates the Eighth Amendment." *Id.* at 1270-71 (quoting *Farmer*, 511 U.S. at 828). The Tenth Circuit has held:

> A prison official who "knows of and disregards an excessive risk to inmate health or safety" is deliberately indifferent for these purposes. Therefore, in order to establish a cognizable Eighth Amendment claim for failure to protect, a plaintiff "must show that he is incarcerated under conditions posing a substantial risk of serious harm," the objective component, and that the prison official was deliberately indifferent to his safety, the subjective component.

*Id.* at 1271 (quoting *Farmer*, 511 U.S. at 834).[3]

---

[3] "When an inmate suffers severe injuries due to an attack by another inmate, the first prong of the Eighth Amendment test is typically met." *Davidson v. Kansas*, CIVIL ACTION No. 99-3235-KHV, 2001 U.S. Dist. LEXIS 6375, at *10-11, 2001 WL 533207, at *3 (D. Kan. Mar. 13, 2001) (citing *Iwanski v. Okla. Dep't of Corr.*, 201 F.3d 448, No. 98-5135, 1999 U.S. App. LEXIS 325851999 WL 1188836 (10th Cir. 1999); *Lopez v. LeMaster*, 172 F.3d 756 (10th Cir. 1999); *Sims v. Schaad*, 185 F.3d 875, 1999 WL 387158 (10th Cir. 1999); *Northington v. Marin*,

Defendant Rumer similarly violated Mr. Hunter's substantive due process rights under the Fourteenth Amendment, which existed under the "special custodial relationship" created by Mr. Hunter's involuntary confinement. *See, e.g.*, *Schwartz v. Booker*, 702 F.3d 573, 579 (10th Cir. 2012) (citing *DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 197 (1989)). "[T]he safety and bodily integrity of convicted prisoners implicates both the Eighth Amendment's prohibition against cruel and unusual punishment and the Fourteenth Amendment's substantive protection against state deprivation of life and liberty without due process of law, and . . . the legal standards under the two amendments are identical . . . ." *Berry*, 900 F.2d at 1494 n.6.

## B.     Collusion

The analysis of Defendant Rumer's unconstitutional conduct could begin and end with his collusion with inmate Page and others to attack Mr. Hunter, which goes well beyond deliberate indifference. *See, e.g.*, *Brown v. Gray*, Case No. 06-3003-JTM, 2011 U.S. Dist. LEXIS 140848, at *27, 59 (D. Kan. Dec. 7, 2011)  (denying summary judgment as to Eighth Amendment deliberate indifference claim where plaintiff contended that defendant had conspired to have inmates stab him).  On the afternoon of July 18, 2011, Defendant Rumer told inmate Amos Page that Mr. Hunter had been "snitching" on Page and his crew.  RSUMF ¶ 19.  Defendant Rumer offered to turn off

---

102 F.3d 1564 (10th Cir. 1996); *Hawkinson v. Romer*, 57 F.3d 1080, 1995 WL 353187 (10th Cir. 1995); *Berry v. City of Muskogee*, 900 F.2d 1489 (10th Cir. 1990)).  However, the Eighth Amendment reaches "conduct that 'is sure or very likely to cause' serious injury at the hands of other inmates." *Benefield*, 241 F.3d at 1272 (quoting *Helling v. McKinney*, 509 U.S. 25, 33 (1993)).

the lights to cell 103 so that Page could take care of the situation and told Page to make sure the assault occurred before his shift was over.  *Id.*  Page said the attack could not have been pulled off without Defendant Rumer's help.  SADF ¶ 61.

Defendant Rumer "knew the consequences on Hunter were going to be severe," based on previous experiences with Page and his crew.  RSUMF ¶ 19.  Defendant Rumer had a longstanding "business" relationship with Page, and allowed Page and his crew to run Pod 3A.  SADF ¶¶ 4-6, 11.  This resulted in a dangerous environment in which contraband, including drugs and hooch, were prevalent.  SADF ¶¶ 7-8, 14.  Defendant Rumer allowed and encouraged rampant fighting, including by turning off the lights to cells, and had even asked Page to inflict violence on inmates he did not like.  RSUMF ¶ 3; SADF ¶¶ 9-10.  During the investigation of the attack, Defendant Rumer continued to protect Page and the other assailants.  SADF ¶¶ 68-70.  He even had the assailants clean up cell 103 after the attack.  SADF ¶ 55.

Additional factors demonstrate that Defendant Rumer was a guard who would indeed be involved in an attack on an inmate, especially one he did not like.  Defendant Rumer was a guard who did not care about the inmates and turned a blind eye to their activities.  SADF ¶¶ 1-2.  He drank on the job.  SADF ¶ 3.  He endangered inmates by discussing inmate grievances and their underlying crimes with other inmates, SADF ¶ 12, and he did not care for Mr. Hunter.  SADF ¶ 13.   The DSD disciplined and considered terminating Defendant Rumer for making inaccurate statements during the course of its

IAB investigation, and his explanations and description of the events of July 18, 2011 changed repeatedly. SADF ¶¶ 41-42, 48-52, 74-77, 96, 98-99. His supervisor Sergeant Sich believed Defendant Rumer was being dishonest and considered that he may have been involved in the attack on Mr. Hunter. SADF ¶¶ 101-103.

Defendant Rumer carried out several acts of deliberate indifference that enabled the vicious attack on Mr. Hunter, including:

- inciting Page and his crew to inflict violence upon Mr. Hunter by saying he was snitching on them, RSUMF ¶ 19;

- agreeing to turn the lights off so that the attack would be conducted out of the line of sight of the cameras, RSUMF ¶ 19;

- unlocking the doors while the assailants were supposed to be on lockdown, so that other inmates could enter the cell and so that Page could go retrieve the hot water used to scald Mr. Hunter, SADF ¶¶ 27-34, 44-45; and

- ignoring Mr. Hunter's loud screaming throughout the attack and delaying in finding Mr. Hunter after he claims to have finally heard it, SADF ¶¶ 46-54, 62-64.

As demonstrated below, each of these acts individually would violate Mr. Hunter's rights under the Eighth and Fourteenth Amendments. They are also indicative of Defendant Rumer's role in facilitating the attack on Mr. Hunter.

## C. __Incitement__

Defendant Rumer incited the attack against Mr. Hunter by telling inmate Page that Mr. Hunter was snitching on him and his crew. RSUMF ¶ 19. "A prisoner states an Eighth Amendment violation by alleging that a prison official intended to cause him serious harm by inciting other inmates to do violence against him." *Purkey v. Green*, 28 F. App'x 736, 745 (10th Cir. Kan. Aug. 17, 2001); *see also Benefield*, 241 F.3d at 1271-72; *Northington v. Jackson*, 973 F.2d 1518, 1525 (10th Cir. 1992) ("In this case we have more than an allegation of obdurate or wanton disregard for Mr. Northington's safety; we have an allegation that Deputy Marin intended to do harm to Mr. Northington by inciting inmates to beat him.); *Harris v. Matthews*, 471 F. App'x 758, 763 (10th Cir. Mar. 28, 2011) ("In a number of cases, we have held that labeling an inmate a 'snitch' or otherwise inciting other inmates to harm an inmate states an Eighth Amendment violation, regardless of whether the inmate is ever actually physically harmed." (collecting cases)); *Johnson-Bey v. Ray*, 38 F. App'x 507, 510 (10th Cir. 2002). When an inmate is able to show that a guard incited other inmates to beat him, "it is as if the guard himself inflicted the beating as punishment." *Northington*, 973 F.2d at 1525.

In *Purkey*, the plaintiff alleged that the defendant guard had told four or five inmates that the plaintiff inmate was trying to cause problems for him because he had hit the plaintiff with a milk carton the previous day. 28 F. App'x at 741. The inmates then allegedly told the defendant that if the defendant "would let plaintiff out of his 'room',

they would 'deal with it.'" *Id.*  The plaintiff alleged that the following night, those

inmates confronted him before lockdown, "threatening his life, and an 'assaultive

confrontation' began to develop." *Id.*  The Tenth Circuit held that the plaintiff had

established that the defendant "intended to seriously harm him by inciting inmates to beat

him, thereby stating a violation of the Eighth Amendment." *Id.* at 745.  Similarly, here

Defendant Rumer confirmed with inmate Page that Mr. Hunter was snitching on him, and

Page told Defendant Rumer he would "take care of it."  RSUMF ¶ 19.  Defendant Rumer

then carried out a number of acts, including turning out the lights and unlocking the doors

to cell 103, that enabled the attack.  The result of Defendant Rumer's incitement was a

"mauling" that resulted in facial fractures and burns to Mr. Hunter's genital region that

required four days of hospitalization.  SADF ¶¶ 56-60, 67.

**D.**     **Lights**

Defendant Rumer carried out his role in the attack he incited first by turning off

the lights to cell 103.  *See* RSUMF ¶ 19; SADF ¶ 22.  This act alone constituted

deliberate indifference to Mr. Hunter's safety.  *See Junior v. Anderson*, 724 F.3d 812, 815

(7th Cir. 2013) (holding that an "inference of conscious disregard of a significant risk of

violence" could be drawn where defendant let inmates out of their cells and let them

congregate in a darkened corridor before leaving her post).[4]  Defendant Rumer had on

---

[4] The cases cited in Defendant Rumer's Motion regarding lights in prisons have no bearing on
the facts of this case.  *See Scarver v. Litscher*, 434 F.3d 972, 974-76 (7th Cir. 2006) (deliberate
indifference found where inmate's mental illness was exacerbated by the leaving on of lights on
for 24 hours); *Williams v. Horner*, 403 F. App'x 138, 142 (8th Cir. Nov. 30, 2010) (deprivation

previous occasions turned out lights to allow inmates to fight. RSUMF ¶ 4. The turning off of the lights, which violated DSD Post Orders and contributed to his 40-day suspension, SADF ¶¶ 72, 73, resulted in the cameras not capturing the attack in 103, RSUMF ¶ 2, and prevented him from being able to see into the cell during his round. SADF ¶¶ 78, 84.

Defendant Rumer's explanation that he turned off the lights because the inmates were hot is contradicted by ample evidence. RSUMF ¶ 2. Defendant Rumer has repeatedly changed his story as to whether he had been given discretion to turn off the lights, SADF ¶¶ 74-77, and he was disciplined for his inaccurate statements in this regard. SADF ¶ 100. Prior to the attack, Sergeant Sich had reprimanded Defendant Rumer for turning off the lights during the day. SADF ¶ 76. There is at the very least a dispute of material fact with regard to Defendant Rumer's reason for turning off of the lights in cell 103, and in fact much more in proving his deliberate indifference to Mr. Hunter's safety through this act.

**E.      Doors**

Defendant Rumer then opened the door to cell 103, allowing Page and the other assailants to further conspire with him and other inmates, enter and leave the cell at will, and ultimately obtain the hot water they used to burn Mr. Hunter's genitalia and thighs.

---

of artificial lighting in cell during daylight hours for a total of approximately eight hours over the course of seven months not constitutional violation); *Kramer v. Conway*, 1:13-cv-1214-WSD, 2013 U.S. Dist. LEXIS 119914, 2013 WL 4505592 (N.D. Ga. Aug. 23, 2013) (alteration of lights policy was accommodation for Orthodox Jewish prisoner in RLUIPA case).

SADF ¶¶ 27, 44, 45. Courts have repeatedly held that unlocking a door to facilitate an inmate attack constitutes deliberate indifference. *See, e.g.*, *Fischl v. Armitage*, 128 F.3d 50, 58 (2d Cir. 1997); *Pavlick v. Mifflin*, 90 F.3d 205, 208-09 (7th Cir. 1996); *Harter v. Budge*, 119 F. App'x 96, 97 (9th Cir. Dec. 6, 2004); *Harper v. Rudek*, Case No. CIV-11-995-HE, 2012 U.S. Dist. LEXIS 10542, at *7, 2012 WL 262986, at *3 (W.D. Okla. Jan. 30, 2012). Prior to the attack on Mr. Hunter, Defendant Rumer had been reprimanded for not securing cell doors, and the DSD Post Orders had been revised to clarify that inmates were never allowed to secure their own doors, as Defendant Rumer said he did with cell 103 during the attack on Mr. Hunter. SADF ¶¶ 79-80; RSUMF ¶ 8. Defendant Rumer's claim that he let the assailants out so that they could clean their cell is belied by contradictory evidence, the common logic that they could not have cleaned in the dark, and the fact that they and other inmates were allowed to enter and leave cell 103 at will for some time. SADF ¶¶ 28-34, 45.

Similar contentions by guards have previously fallen on deaf ears. *See Atkins v. Quinn*, No. 96 C 2228, 1999 U.S. Dist. LEXIS 2747, at *6, 1999 WL 138794, at *3 (N.D. Ill. Mar. 4, 1999) ("Here, the plaintiff claims that Murphy unlocked his cell door knowing that Logan was angry at the plaintiff and was armed with a broom for a weapon; Murphy, on the other hand, contends that he was unaware of any conflict and unlocked the cell door in good faith so that the plaintiff could empty his trash. A jury must decide whether Murphy acted with deliberate indifference to a known risk to the plaintiff."). Defendant

Rumer's assertion that he let the tier porters out all the time, SADF ¶¶ 17-18, RSUMF ¶ 11, only further reinforces his deliberate indifference to Mr. Hunter's safety. *Davis v. LeBlanc*, NO. CV10-01920, 2011 U.S. Dist. LEXIS 151015, 12, 2011 WL 6965835, at *4 (W.D. La. Dec. 9, 2011) ("Allowing inmates unrestricted movement in a prison creates a substantial risk to inmate safety." (citing *Rose v. Carey*, No. 1:06-cv-1504-SEB-JMS, 2008 U.S. Dist. LEXIS 74544, at *5, 2008 WL 4443229, at *5 (S.D. Fla. Sept. 25, 2008)); *see also* SADF ¶ 81.

## F.  Rounds

As the attack on Mr. Hunter was ongoing, Defendant Rumer was supposed to be conducting rounds intended to ensure Mr. Hunter's safety and wellbeing, but instead he went through the motions for appearances while he allowed the attack to occur. First, after the attack on Mr. Hunter had commenced, Defendant Rumer conducted a roll call during which he overlooked the attack. SADF ¶ 21. Then, after Defendant Rumer had turned out the lights in cell 103, he conducted a very rapid round that took him two minutes total and in which he did not even break stride. SADF ¶¶ 36-37. Defendant Rumer walked right by cell 103 and did nothing while Mr. Hunter was being assaulted, as he spent two or three seconds in front of the cell and did not even pass all the cell windows. SADF ¶¶ 38-39. *See Fickes v. Jefferson County*, 900 F. Supp. 84, 89 (E.D. Tex. 1995) ("If Officer Square knew of the ongoing attack when he made his rounds and chose to do nothing, this could rise to the level of deliberate indifference.").

DSD considers rounds essential in ensuring inmate wellbeing and safety and in preventing fights. SADF ¶¶ 85-86. Defendant Rumer, however, did not perform any of the DSD requirements for rounds. SADF ¶¶ 83, 87-90. When asked to describe Defendant Rumer's round, Sergeant Sich said it was "what he considers to be a round." SADF ¶ 82. Merely looking into each cell given the circumstances is hardly sufficient to demonstrate that Defendant Rumer was not deliberately indifferent to Mr. Hunter's safety, and in any regard, it appears that he did not even do that. RSUMF ¶ 10. Deputies are expected to go into every cell during a round to overcome visual limitations from outside cells, and should visually observe the inmates and talk to the inmates during the rounds. SADF ¶¶ 88-89; RSUMF ¶ 9; *see Jimenez v. Hopkins County*, 4:11-CV-00033-JHM, 2014 U.S. Dist. LEXIS 3722, *36-39 (W.D. Ky. Jan. 13, 2014) (guards' failure to enter cell and communicate with inmate during round demonstrated deliberate indifference to inmate's medical condition). Instead, Defendant Rumer rapidly walked by cell 103 with the lights off, which did not allow him to have any awareness of what was going on inside. SADF ¶¶ 84, 91. At best, Defendant Rumer was exhibiting willful ignorance of the attack that he had enabled.

**G.     Access to Weapons**

Defendant Rumer's knowledge of available dangerous weapons was another factor that constituted conscious disregard for Mr. Hunter's safety. The Tenth Circuit has held that "the Eighth Amendment may be violated when prison officials permit inmate access

to objects which could be used as weapons, especially when this conduct is accompanied by a lack of adequate supervision over the inmates." *Iwanski*, 1999 U.S. App. LEXIS 32585, at *11-12 (citing, *inter alia*, *Berry*, 900 F.2d at 1497-98 (holding jury could find deliberate indifference to inmate safety based on evidence that (1) inmates, including crime partners, had 24-hour access to each other; (2) access to wire brooms was not controlled, thereby providing a readily accessible and dangerous weapon; (3) supervision was grossly inadequate; and (4) a jailer had been informed that the inmate feared for his life)).

Defendant Rumer allowed inmates to have unlimited access to hot water, which he knew was a dangerous weapon. Defendant Rumer had overheard inmates say that the water was hot, and inmates had complained about how hot the water was. RSUMF ¶ 5. Inmates described the extreme temperature of the water through observations such as that it melted plastic containers. SADF ¶ 92. During his IAB interview, Defendant Rumer expressed his concerns regarding inmate access to water the hot water. SADF ¶ 93. He acknowledged that water that hot could be used as a weapon and that inmate access to it was unrestricted at the time of the attack. SADF ¶ 94. The burns that Mr. Hunter suffered to his genitalia and thighs leave him with permanent scars and numbness. SADF ¶¶ 36-60.[5]

---

[5] In addition, had the assailants carried out their plan to smother Mr. Hunter to death with a trash bag, Defendant Rumer would have provided them with the lethal weapon by violating his own stated policy that inmates did not receive trash bags unless they presented him with a used one. SADF ¶¶ 41-43.

**H.** **Delayed Response**

The circumstances of the attack and Defendant Rumer's behavior made evident that he was ignoring and willfully delaying in responding to a lengthy, brutal attack. Inmates could tell Defendant Rumer was ignoring the attack. SADF ¶ 67. They were sure he could hear the attack, as Mr. Hunter was screaming extremely loudly and for a long period of time. SADF ¶¶ 63-64. This was a "mauling and torture" in which Mr. Hunter was knocked unconscious several times. SADF ¶¶ 65-67.

Thus, Defendant Rumer's blatant, galling ignorance of the attack as it was occurring in his plain earshot also constitutes deliberate indifference. *Amick v. Ohio Dep't of Rehab. & Corr.*, 521 F. App'x 354, 363 (6th Cir. Mar. 27, 2013) (denying summary judgment as to deliberate indifference where defendants disregarded inmates' calls for help for up to thirty minutes (citing *Farmer*, 511 U.S. at 842)); *Yates v. King*, CASE NO. 1:10-cv-00530-SKO PC, 2010 U.S. Dist. LEXIS 125060, at *5-6, 2010 WL 4718317, at *2-3 (E.D. Cal. Nov. 12, 2010) (finding deliberate indifference where defendant saw attack and sexual assault taking place and heard plaintiff's cries for help but ignored the situation and walked past plaintiff); *Fossett v. Morris*, No. 86 Civ. 3800 (MJL), 1991 U.S. Dist. LEXIS 5188, at *4, 1991 WL 67093, at *3 (S.D.N.Y. Apr. 22, 1991) (guards who witness inmate attacks and stand by and allow the attack to occur are deliberately indifferent to inmate safety and wellbeing (citing *Morales v. New York State Dept of Corrections*, 842 F.2d 27 (2d Cir. 1988)).

Even Defendant Rumer's delay in responding to the attack after he claims to have finally heard the scream from right in front of cell 103, SADF ¶¶ 48, 54, is sufficient for denial of summary judgment as to deliberate indifference. *See Lee v. Fed. Bureau of Prisons*, 2001 U.S. Dist. LEXIS 17255, at *9-10 (D. Kan. Sept. 28, 2001) (finding relevant to deliberate indifference whether attack occurred for a few seconds or whether it lasted four or five minutes while plaintiff called for help and guards stood and watched). Defendant Rumer's claim that he had trouble hearing where the scream was coming from is belied by others' testimony that it was not difficult to locate from which cell shouts might be coming, SADF ¶ 51, and contradicted by his own statements to IAB that he immediately knew the location of the scream, SADF ¶ 52. Inmates had no idea why Defendant Rumer took so long to respond and thought he was intentionally delaying. SADF ¶ 53. Defendant Rumer's standing by as Mr. Hunter suffered this vicious attack is a clear embodiment of his deliberate indifference to Mr. Hunter's safety and wellbeing.

I.    **Defendant Rumer's Constitutional Violations Were Clearly Established**

Defendant Rumer is not entitled to qualified immunity. Any argument that it is not clearly established that a guard cannot collude with inmates to carry out an attack on an inmate takes the qualified immunity analysis to its logical extreme and renders it an absurdity. This is perhaps what Defendant Rumer aims to do in his Motion by isolating each of his individual acts from his overall collusion with Mr. Hunter's attackers, and arguing that none of them alone constitutes a clearly established constitutional violation.

49

But even then Defendant Rumer's logic fails. For example, it has been clearly established at least since 1992 that labeling an inmate a snitch constitutes deliberate indifference to the safety of that inmate. *Benefield*, 241 F.3d at 1271 (citing *Northington*, 102 F.3d at 1567). And it has been clearly established for even longer that providing inmates access to objects that can be used as weapons violates the Eighth Amendment. *See Iwanski*, 1999 U.S. App. LEXIS 32585, at *11-12 (citing *Berry*, 900 F.2d at 1497-99).

The Supreme Court has held that "the easiest cases don't even arise. There has never been a section 1983 case accusing welfare officials of selling foster children into slavery; it does not follow that if such a case arose, the officials would be immune from damages or criminal liability." *United States v. Lanier*, 520 U.S. 259, 271 (1997) (internal quotation marks and alterations omitted). Defendant Rumer does not need a factually identical case to put him on notice that he violated the Constitution by colluding with inmates to carry out an attack, inciting the violence, and facilitating the attack by turning out the lights, unlocking the doors, providing the weapon, and delaying his response. His case is the easy one where his actions are so outrageous and despicable that the constitutional violations are blatantly clear.

## VI. CONCLUSION

Based on the foregoing, which includes substantial disputed material facts as found in the record evidence, Mr. Hunter respectfully requests that the Court deny Defendant Rumer's dispositive motion.

Respectfully submitted this 28th day of January 2014.

RATHOD | MOHAMEDBHAI, LLC

*s/ Arash Jahanian*
Arash Jahanian
Qusair Mohamedbhai
Matthew Cron
Siddhartha Rathod
1518 Blake Street
Denver, CO 80202
(303) 578-4400 (telephone)
(303) 578-4401 (fax)
aj@rmlawyers.com
qm@rmlawyers.com
mc@rmlawyers.com
sr@rmlawyers.com

ATTORNEYS FOR PLAINTIFF

## CERTIFICATE OF SERVICE

I hereby certify that on January 28, 2014, I electronically filed the foregoing **PLAINTIFF'S RESPONSE TO DEFENDANT DENVER'S MOTION FOR SUMMARY JUDGMENT** with the Clerk of the Court using the CM/ECF system, which will send electronic notification to the following:

Denver City Attorney's Office
201 West Colfax Avenue
Denver, Colorado 80202

Stuart Shapiro, Esq.          stuart.shapiro@denvergov.org

Cristina Peña Helm, Esq.   cristina.helm@denvergov.org

Barry Schwartz, Esq.        barry.schwartz@denvergov.org

ATTORNEYS FOR DEFENDANT CITY AND COUNTY OF DENVER, ANTHONY MAZZEI, AND EDWARD KELLER

Senter, Goldfarb & Rice, LLC
1700 Broadway, Suite 1700
Denver, CO 80290

Thomas S. Rice, Esq.         trice@sgrllc.com

Ashley M. Kelliher, Esq.    akelliher@sgrllc.com

ATTORNEYS FOR DEFENDANT GAYNEL RUMER

RATHOD | MOHAMEDBHAI, LLC

*s/ Arash Jahanian*
Arash Jahanian